# IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

María Murguía                                    Appellant/Plaintiff

v.                          Case No. 22-2831

Charisse Childers, in her
official capacity as Director,
Arkansas Division of Workforce
Services                                    Appellee/Defendant

---

Platintiff's Appeal from the U.S. District Court
Western District of Arkansas
Case No. 5:20-cv-5221
The Honorable Timothy L. Brooks

Appellant's Brief

---

Kevin De Liban (2012044)          Legal Aid of Arkansas
Trevor Hawkins (2017224)          310 Mid-Continent Plz., Ste. 420
Jaden Atkins (2020128)            West Memphis, AR 72301
                                  P: (800) 967-9224 x. 2206
                                  F: (870) 910-5562

                                  kdeliban@arlegalaid.org
                                  thawkins@arlegalaid.org
                                  jatkins@arlegalaid.org


                        Counsel for Appellant

## Summary of the Case and Request for Oral Argument

Appellant María Murguía initiated this action pursuant to Title VI of the Civil Rights Act against Charisse Childers, in her official capacity as Director of the Arkansas Division of Workforce Services ("DWS"). DWS administers Arkansas's Unemployment Insurance ("UI") program. Murguía, a Spanish-speaking person, experienced national origin discrimination when DWS failed to provide her with meaningful access to UI benefits as required under Title VI and controlling regulations.

This appeal is from the District Court's Order granting DWS's Motion for Summary Judgment and the accompanying dismissal. Although the District Court recognized extensive proof of the agency's misdeeds, the Court improperly weighed evidence in evaluating DWS's pretextual explanations and concluding that Murguía lacked sufficient evidence of discriminatory intent. The District Court further erred in declining to apply a deliberate indifference standard, an appropriate standard to evaluate the actions of the state agency supported in case law. Thus, this Court should reverse the District Court's decision and allow the case to proceed to a jury.

Based on the significant issues of law and complex facts presented by this case, Appellant requests 30 minutes of oral argument.

Appellate Case: 22-2831     Page: 2     Date Filed: 12/19/2022 Entry ID: 5228614

# Table of Contents

Summary of the Case.........................................................................ii

Table of Contents ..........................................................................iii

Table of Authorities ........................................................................ v

Jurisdictional Statement .................................................................. 1

Statement of Issues Presented ........................................................ 2

Statement of the Case ..................................................................... 3

Summary of the Argument............................................................... 7

Argument ......................................................................................... 8

**I.   Controlling deference is owed to decades-old federal regulations and guidance interpreting national origin discrimination to include the denial of language access services ........................................................................... 9**

    a.  Title VI.......................................................................... 10

    b.  The Workforce Innovation and Opportunity Act. .............. 13

    c.  Federal Policy Guidance........................................... 17

    d.  Deference. ................................................................. 20

**II.  Murguía created a triable inference of discrimination through   evidence of repeated language service denials and misconduct by an agency worker with a known history of discrimination. ........................................................... 26**

Appellate Case: 22-2831     Page: 3     Date Filed: 12/19/2022 Entry ID: 5228614

a. Prima Facie Showing. ............................................................. 27

   i. Translation Denials ............................................. 31

   ii. Interpretation Denials......................................... 35

   iii. System-wide Deficiencies.................................... 38

   iv. Mistreatment by DWS Worker ......................... 41

      A. Past Mistreatment of LEP Individuals.................... 43

      B. Abuse of Subordinates ............................... 46

      C. Outlaw Motorcycle Gang Activities......................... 49

   v. Conclusion on Prima Facie Case ..................... 50

b. Pretext. ................................................................ 52

c. The District Court's Weighing of Evidence. ...................... 55

d. Conclusion on Triable Inference. ........................... 62

**III. The District Court committed reversible error when it declined to assess intentional discrimination through the deliberate indifference standard. ............................................. 63**

**IV. Conclusion.................................................................... 67**

Certificate of Service ................................................................... 69

Certificate of Compliance ........................................................ 70

iv

# Table of Authorities

<u>Cases</u>

*Auer v. Robbins,* 519 U.S. 452 (1997) .............................................. 10, 20, 23

*Alexander v. Sandoval*, 532 U.S. 275 (2001) ......................................... 12, 25

*Almendares v. Palmer*, 284 F. Supp. 2d 799 (N.D. Ohio 2003) .............. 12

*Beeler v. Astrue*, 651 F.3d 954 (8th Cir. 2011) ............................................ 21

*Berndsen v. N. Dakota Univ. Sys.*, 7 F.4th 782 (8th Cir. 2021) .......... 24, 25

*Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247 (3d Cir. 2014) .............. 65

*Cabrera v. Alvarez*, 977 F. Supp. 2d 969 (N.D. Cal. 2013) ...................... 13

*Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979) ...................................... 64

*Chalenor v. Univ. of N. Dakota*, 291 F.3d 1042 (8th Cir. 2002).......... 23, 25

*Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,*
    467 U.S. 837 (1984)........................................................... 10, 20, 23

*Columbus Bd. of Ed. v. Penick*, 443 U.S. 449 (1979) ................................. 31

*Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.,*
    526 U.S. 629 (1999)..................................................................... 64, 65

*Duvall v. Cty. of Kitsap*, 260 F.3d 1124 (9th Cir. 2001) ............................ 66

*Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398 (5th Cir. 2015) ........... 64

*Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998)................. 64,66

*Glover v. Standard Fed. Bank*, 283 F.3d 953 (8th Cir. 2002)..................... 21

*Grandson v. Univ. of Minnesota*, 272 F.3d 568 (8th Cir. 2001)............... 65

*H.P. v. Bd. of Educ. of City of Chicago,*
    385 F. Supp. 3d 623 (N.D. Ill. 2019)..................................................... 13

*Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771 (8th Cir. 1995) .......... 62

*Karsjens v. Lourey*, 988 F.3d 1047 (8th Cir. 2021) .................................... 63

*Lau v. Nichols*, 414 U.S. 563 (1974)............................................................. 12

Appellate Case: 22-2831      Page: 5      Date Filed: 12/19/2022 Entry ID: 5228614

*Leonetti's Frozen Foods, Inc. v. Rew Mktg., Inc.,*
   887 F.3d 438 (8th Cir. 2018) ..................................................... 8

*Lewis v. Heartland Inns of Am., L.L.C.,*
   591 F.3d 1033 (8th Cir. 2010)............................................... 27, 30

*Liese v. Indian River Cty. Hosp. Dist.,*
   701 F.3d 334 (11th Cir. 2012)............................................... 66, 67

*Liles v. C.S. McCrossan, Inc.*, 851 F.3d 810 (8th Cir. 2017) .................... 52

*Meagley v. City of Little Rock*, 639 F.3d 384 (8th Cir. 2011) ................... 66

*Mensie v. City of Little Rock*, 917 F.3d 685 (8th Cir. 2019) ..................... 30

*Quick v. Donaldson Co.*, 90 F.3d 1372 (8th Cir. 1996)............................... 8

*Rowles v. Curators of Univ. of Missouri,*
   983 F.3d 345 (8th Cir. 2020)...................................................... 26

*Segal v. Metro. Council*, 29 F.4th 399 (8th Cir. 2022) ............... 8, 29, 30, 62

*S.H. ex rel. Durrell v. Lower Merion Sch. Dist.,*
   729 F.3d 248 (3d Cir. 2013) ..................................................... 65,

*United States v. Maricopa Cty., Ariz.,*
   915 F. Supp. 2d 1073 (D. Ariz. 2012)............................................ 13, 25

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.,*
   429 U.S. 252 (1977)............................................................. 30, 62

**Federal Statutes**

20 U.S.C. § 1681 ..................................................................... 64

28 U.S.C. § 1291 ...................................................................... 1

29 U.S.C. § 2938 ..................................................................... 15

29 U.S.C. § 3248 ..................................................................... 14

42 U.S.C. § 2000d...............................................................1, 10, 64

42 U.S.C. § 12132 .................................................................... 29

Appellate Case: 22-2831     Page: 6     Date Filed: 12/19/2022 Entry ID: 5228614

Federal Regulations

28 C.F.R. § 42.104 ............................................................... 11, 18

28 C.F.R. § 42.405 ...................................................... 12, 18, 22, 23

29 C.F.R. § 31.3 ................................................................. 11, 19

29 C.F.R.§ 37.35 ................................................................ 16-17

29 C.F.R. § 38.4 ................................................................ 14, 34

29 C.F.R. § 38.9 ...................................................... 15,16, 22, 23

Other

Executive Order 11764, Nondiscrimination in Federally Assisted
Programs, 39 Fed. Reg. 2575 (Jan. 23, 1974) ........................................... 10

Nondiscrimination; Equal Employment Opportunity; Policies and
Procedures, 41 Fed. Reg. 52669 (Dec. 1, 1976) ....................................... 11

Enforcement of Title VI of the Civil Rights Act of 1964—National
Origin Discrimination Against Persons with Limited English
Proficiency; Policy Guidance, 65 Fed. Reg. 50123 (Aug. 16, 2000) ..... 17

Guidance to Federal Financial Assistance Recipients Regarding Title
VI Prohibition Against National Origin Discrimination Affecting
Limited English Proficient Persons,
67 Fed. Reg. 41455 (June 18, 2002) ..................................................... 18, 19

Policy Guidance to Federal Financial Assistance Recipients
Regarding the Title VI Prohibition Against National Origin
Discrimination Affecting Limited English Proficient Persons,
68 Fed. Reg. 32290 (May 29, 2003) .......................................................... 19

Appellate Case: 22-2831    Page: 7    Date Filed: 12/19/2022 Entry ID: 5228614

Implementation of the Nondiscrimination and Equal Opportunity Provisions of the Workforce Innovation and Opportunity Act, 81 Fed. Reg. 87130 (Dec. 2, 2016) ............................................................ 14

Unemployment Insurance Program Letter (UIPL) 02-16 (October 1, 2015) ......................................................................................................... 19

Unemployment Insurance Program Letter (UIPL) 02-16, Change I (May 11, 2020) ...................................................................................... 20, 53

Appellate Case: 22-2831     Page: 8     Date Filed: 12/19/2022 Entry ID: 5228614

## Jurisdictional Statement

The District Court had federal question jurisdiction of Murguía's claim that DWS violated Title VI of the Civil Rights Act. 42 U.S.C. § 2000d. This appeal is from the District Court's 7/22/22 Order granting DWS's Motion for Summary Judgment and the related judgment dismissing the case with prejudice. (**App.VI**, 2316–2356; **R.Doc. 165, 170**). Murguía filed her Notice of Appeal on 8/18/22. This Court has appellate jurisdiction under 28 U.S.C. § 1291.

1

## Statement of Issues Presented

**I.    Controlling deference is owed to decades-old federal regulations and guidance interpreting national origin discrimination to include the denial of language access services.**

*Beeler v. Astrue*, 651 F.3d 954, 959 (8th Cir. 2011)
*Berndsen v. N. Dakota Univ. Sys.*, 7 F.4th 782, 784, n. 3 (8th Cir. 2021)
42 U.S.C. § 2000d
29 U.S.C. § 3248

**II.    Murguía created a triable inference of discrimination through evidence of repeated language service denials and misconduct by an agency worker with a known history of discrimination.**

*Columbus Bd. of Ed. v. Penick*, 443 U.S. 449, 465 (1979)
*Lewis v. Heartland Inns of Am., L.L.C.*, 591 F.3d 1033, 1039 (8th Cir. 2010)
*Segal v. Metro. Council*, 29 F.4th 399, 403 (8th Cir. 2022)
*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–68 (1977)

**III.    The District Court committed reversible error when it declined to assess intentional discrimination through the deliberate indifference standard.**

*Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 272 (3d Cir. 2014)
*Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 291 (1998)
*Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 347 (11th Cir. 2012)

Appellate Case: 22-2831    Page: 10    Date Filed: 12/19/2022 Entry ID: 5228614

## Statement of the Case

Ms. Murguía's travails obtaining unemployment insurance ("UI") from the Arkansas Division of Workforce Services ("DWS") evoke operatic notes of bureaucratic tragedy.

Laid off from her job cleaning hotel rooms near the start of the COVID-19 pandemic, Murguía applied for UI benefits in early April 2020. (**App.I**, 258, 282, 319; **II**, 353; **III**, 761, 1042–43; **R.Doc. 130**, 6; **130-1**, 10, 47, 81; **130-2**, 168; **130-3**, 124–25). She would not receive any benefits until the end of March 2021, a year after applying and three months after filing suit under Title VI alleging that DWS's actions constituted national origin discrimination. (**App.III**, 1037–40; **R.Doc. 130**, 13–14; **130-3**, 119–21).

All told, DWS deprived her of meaningful access to services for two years. Speaking only Spanish (**App.III**, 757; **R.Doc. 130-2**, 164), Murguía never received proper interpretation or translation[1] services from DWS despite both explicit requests and longstanding regulations requiring language services. As a result, she was not able to fully understand the information conveyed in her three office visits and the roughly two dozen

---

[1] Interpretation refers to verbal communication. Translation refers to written communication.

3

forms DWS sent containing "vital information" provided only in English. Some of these forms simply provided information to Murguía in English; some also sought information from her that would be used to determine her eligibility. In turn, Murguía was forced to rely on her 19-year-old daughter, whose one year of high school Spanish did not qualify her to interpret or translate technical UI terms. (**App.I**, 285–86, 288–89, 313; **II**, 381–89; **R.Doc 130-1**, 13–14, 16–17, 41, 109–17). The language-based exclusion would cause Murguía to experience lengthy processing delays, misunderstand program requirements, and be forced to sign forms in English when Spanish versions were available. *Infra* at 26–42.

The saga did not end when Murguía eventually received benefits. Shortly after determining Murguía eligible, DWS opened fraud proceedings against her that would last nearly another year before being proven unsubstantiated. (**App.III**, 887–89, 1127–30; **R.Doc. 130-2**, 294–96; **130-3**, 209–12). The paperwork and hearings involved were, predictably, riddled with more deprivations of language services. (Id.; **App.III**, 871–86, 1101–04, 1131–32; **R.Doc. 130-2**, 278–283; **130-3**, 183–86, 213–14). And, as discovery showed, Murguía was not the only Limited English Proficiency ("LEP") person impacted by DWS's language access deficiencies. Manifold complaints by

4

LEP people demonstrate fundamental obstacles accessing DWS's services that are not faced by English-speaking people. *Infra* at 28–29.

In addition to language access deprivations, Murguía experienced outright hostility from agency staff. When Murguía went to the DWS office in August 2020 to provide documents establishing her eligibility, she was denied assistance and treated badly by an agency worker. *Infra* at 42–43. While refusing to take Murguía's documents and failing to note the encounter in the agency's case management system, that worker ran an improper immigration status check on her even though her status had been verified months before. He also gave her false information that no benefits would be available to her. As it turns out, this worker has a history known to DWS management of discriminating against Spanish-speaking clients and co-workers. *Infra* at 43–50.

Economic privation, frustration, and worry were not the only costs Murguía bore. By the time Murguía received benefits, she missed out on $1,800 that would have been available had DWS acted sooner. (**App. II**, 717–21; **R.Doc. 130-2**, 124–28).

The District Court opinion granting summary judgment to DWS recognizes the extensive proof of the agency's misdeeds. "[E]mpathiz[ing]

5

deeply with Ms. Murguía," the District Court found that DWS committed a "cascade" of errors, that "DWS failed" its mission with respect to Murguía, that "DWS did not provide Ms. Murguía adequate LEP services," that "DWS's LEP policies and practices often proved deficient," that "DWS's system does not reliably ensure that Spanish-speaking clients will receive information in Spanish," and that the racist agency worker's "behavior was appalling—and so was DWS's response." (**App.VI**, 2325, 2332, 2336; **R.Doc. 165**, 10, 17, 21).

Nonetheless, the District Court crossed into the jury's province when evaluating the *explanation* of the misdeeds. The Plaintiff presented ample evidence of discriminatory intent: repeated violations of language access mandates after DWS was on notice of Murguía's needs, agency spreadsheets and emails showing that Spanish-speaking individuals experienced a particularized form of exclusion, agency-wide deficiencies in providing language services, leadership comments that language access requirements are "unAmerican," and agency knowledge of the racist agency worker's past discriminatory behavior. *Infra* at 27–52. Still, the District Court discounted the totality of this evidence and, with scant support, attributed Murguía's mistreatment to "the pandemic's effect on agency workload and operations"

6

and "the agency's out-of-date computer system." (**App.VI**, 2332, 2344; **R.Doc. 165**, 17, 19). Weighing evidence and determining underlying causes are inappropriate actions at summary judgment.

In addition, the District Court declined to assess discriminatory intent through deliberate indifference, a standard apt for these circumstances and supported by jurisprudence in and out of the Eighth Circuit.

Because the record contains sufficient evidence for a reasonable jury to draw an inference of discriminatory intent, the District's Court's decision should be reversed, allowing Murguía's claim to proceed to trial.

## Summary of the Argument

National origin discrimination has long been interpreted to include the denial of language services that prevent LEP individuals from participating in—or having "meaningful access" to—federally funded programs. Here, Murguía experienced repeated language access denials over the span of two years, forcing her to wait a year for benefits, face a fraud investigation, and be unable to conduct any DWS-related business without her daughter's help. She presented extensive evidence of these violations, of DWS's system-wide language access failures, and of outright hostility from an agency worker with a known history of discrimination. While agreeing that the agency

7

failed to adequately serve her, the District Court improperly weighed evidence to attribute DWS's failures to causes other than discriminatory intent. Whether through the *McDonnell Douglas* framework or deliberate indifference, Murguía's claim surmounts barriers to summary judgment and should be permitted to go to trial.

## Argument

This Court "review[s] a district court's decision granting summary judgment *de novo*, viewing the evidence in the light most favorable to the non-moving party and resolving all reasonable inferences in its favor." *Segal v. Metro. Council*, 29 F.4th 399, 403 (8th Cir. 2022). "Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)). A genuine dispute exists if "a reasonable jury could return a verdict for the nonmoving party based on the evidence." *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376 (8th Cir. 1996). When considering summary judgment, "a district court should not weigh the evidence, make credibility determinations, or attempt to determine the truth of the matter." *Leonetti's Frozen Foods, Inc. v. Rew Mktg., Inc.*, 887 F.3d 438, 442 (8th Cir. 2018).

Appellate Case: 22-2831    Page: 16    Date Filed: 12/19/2022 Entry ID: 5228614

Respectfully, the District Court did not heed the fact-finder's boundary when it discounted evidence of discriminatory intent in favor of alternative explanations. The argument proceeds in three parts. First, time-tested regulations and guidance tying national origin discrimination to language access denials are entitled to controlling deference. Second, Murguía presented sufficient evidence to create a triable inference of discriminatory intent. Third, deliberate indifference is a valid standard to determine intent, and the District Court erred by not applying it.

I.  **Controlling deference is owed to decades-old federal regulations and guidance interpreting national origin discrimination to include the denial of language access services.**

The Supreme Court, various federal courts, federal regulations, and regulatory guidance recognize national origin and language are linked so that the denial of necessary language services results in impermissible national origin discrimination. At bottom, recipients of federal funds like DWS must take affirmative steps to provide "meaningful access" to services for LEP individuals.

Language access requirements are detailed in agency regulations and guidance that have weathered decades and several presidential

9

administrations with authority to change them. As such, they are entitled to deference under the *Chevron* and *Auer* frameworks, respectively. This section first discusses the various statutes, regulations, and guidance at issue before applying the appropriate deference standards.

### a.    Title VI

Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. The statute delegates authority to federal agencies providing federal funds to "effectuate the provisions of [42 U.S.C. § 2000d]…by issuing rules, regulations, or orders of general applicability…consistent with achievement of the objectives of the statute authorizing the financial assistance…." 42 U.S.C. § 2000d-1. Agency rulemaking must be approved by the President, *id.*, who has since delegated the authority to the U.S. Department of Justice ("DOJ"). *See, e.g.*, Executive Order 11764, Nondiscrimination in Federally Assisted Programs, 39 Fed. Reg. 2575 (Jan. 23, 1974).

The DOJ promulgated implementing regulations that provide a non-exhaustive list of prohibited actions. Among others, a recipient of federal

Appellate Case: 22-2831     Page: 18     Date Filed: 12/19/2022 Entry ID: 5228614

funds "may not...on the ground of race, color, or national origin" deny a service or benefit, provide a service or benefit in a different manner, restrict the enjoyment of any advantage enjoyed by others receiving a service or benefit, treat an individual differently in determining eligibility for a service or benefit, or deny an individual the opportunity to participate. 28 C.F.R. § 42.104(b)(1); *see also* 29 C.F.R. § 31.3(b)(1) (corresponding U.S. Department of Labor ("DOL") regulation).

In 1976, the DOJ connected these forms of discrimination—particularly the denial of the opportunity to participate—to language. *See* Nondiscrimination; Equal Employment Opportunity; Policies and Procedures, 41 Fed. Reg. 52669 (Dec. 1, 1976). The resulting regulation obligated federal funding recipients to take reasonable steps to provide language services:

> Where a significant number or proportion of the population eligible to be served or likely to be directly affected by a federally assisted program (e.g., affected by relocation) needs service or information in a language other than English in order to *effectively to be informed of or to participate in the program*, the recipient *shall take reasonable steps*, considering the scope of the program and the size and concentration of such population, to provide information in appropriate languages to such persons.

11

This requirement applies with regard to written material of the type which is ordinarily distributed to the public.

28 C.F.R. § 42.405(d)(1) (emphasis added).

The judiciary proceeded similarly, with the Supreme Court linking national origin discrimination and inadequate services to LEP individuals in 1974. In *Lau v. Nichols*, the Court concluded that the San Francisco school district violated Title VI when it failed to provide supplemental English-language services to 1,800 students of Chinese ancestry who did not speak English. 414 U.S. 563, 566 (1974). Noting that the "the Chinese-speaking minority receive fewer benefits than the English-speaking majority," the Court held that the district "denie[d] them a meaningful opportunity to participate in the educational program." *Id.* at 568.

Although *Alexander v. Sandoval*, 532 U.S. 275, 281 (2001), partially abrogated *Lau* to the extent it relied on an unenforceable disparate impact regulation, *Lau's* underlying connection between language and national origin discrimination remained undisturbed. Accordingly, since *Alexander*, district courts facing diverse factual contexts have repeatedly affirmed that language-based barriers to key services constitute national origin discrimination under Title VI. *See, e.g.*, *Almendares v. Palmer*, 284 F. Supp. 2d

12

799, 800 (N.D. Ohio 2003) (food stamp applications, notices, and interpretation services); *United States v. Maricopa Cty., Ariz.*, 915 F. Supp. 2d 1073, 1079 (D. Ariz. 2012) ("sanitary needs, food, clothing, legal information and religious services" in jail); *Cabrera v. Alvarez*, 977 F. Supp. 2d 969, 978 (N.D. Cal. 2013) (public housing repairs); *H.P. v. Bd. of Educ. of City of Chicago*, 385 F. Supp. 3d 623, 637 (N.D. Ill. 2019) (special education documents and interpretation).

With statutes, regulations, and ample precedent, Title VI is the primary means for private enforcement of language access measures. But, the venerable civil rights law is not the lone legal authority tying language access deprivations to national origin discrimination.

### b. The Workforce Innovation and Opportunity Act

State UI agencies must also comply with anti-discrimination requirements in the Workforce Innovation and Opportunity Act ("WIOA") of 2014, a workforce development program. WIOA's Section 188 incorporates the civil rights spectrum:

> No individual shall be excluded from participation in, denied the benefits of, subjected to discrimination under, or denied employment in the administration of or in connection with, any

13

such program or activity because of race, color, religion, sex…, national origin, age, disability, or political affiliation or belief.

29 U.S.C. § 3248(a)(2).[2]

Section 188 commanded the DOL to "issue regulations…adopt[ing] standards for determining discrimination…." 29 U.S.C. § 3248(e). Doing so, the DOL "interpret[ed] the nondiscrimination provisions of WIOA consistent with the principles of…Title VI," concluded that "the definition of national origin discrimination includes discrimination based on limited English proficiency," and specified the language access measures that regulated entities must take to comply. Implementation of the Nondiscrimination and Equal Opportunity Provisions of the Workforce Innovation and Opportunity Act, 81 Fed. Reg. 87130, 87130, 87133 (Dec. 2, 2016).

Ultimately, recipients of federal funds must "*take reasonable steps to ensure meaningful access* to each limited English proficient individual served or encountered so that LEP individuals are effectively informed about

---

[2] Murguía limits her argument about the WIOA and its regulations to deference and does not contend that they provide an independent cause of action. Even so, violations of these regulations can be evidence of discrimination. *Segal*, 29 F.4th at 405.

Appellate Case: 22-2831    Page: 22    Date Filed: 12/19/2022 Entry ID: 5228614

and/or *able to participate* in the program." 29 C.F.R. § 38.9(b) (emphasis added). At a minimum, "meaningful access" requires:

- **Notice**: "providing adequate notice to LEP individuals of the existence of interpretation and translation services and that these language assistance services are available free of charge," 29 C.F.R. § 38.9(e);

- **Language-appropriate communications:** "once a recipient becomes aware of the non-English preferred language of an LEP beneficiary, participant, or applicant for aid, benefit, service, or training, the recipient must convey vital information in that language," 29 C.F.R. § 38.9(h); and

- **Accuracy and timeliness:** "[a]ny language assistance services, whether oral interpretation or written translation, must be accurate, provided in a timely manner and free of charge," 29 C.F.R. § 38.9(d).

The regulations define the key terms to avoid uncertainty. For one, "reasonable steps" include the basic tasks of "determin[ing] language assistance needs" for LEP individuals and "providing oral interpretation or written translation." 29 C.F.R. § 38.9(b)(1). "Vital information" is "information, whether written, oral, or electronic, that is necessary for an individual to understand how to obtain any aid," including "applications, consent [] forms, notices of rights and responsibilities,…rulebooks,…and letters or notices that require a response from [the individual]." 29 C.F.R. §

15

38.4(ttt). And, "timely" means that the language assistance "is provided at a place and time that ensures equal access and avoids the delay or denial of any aid, benefit, service, or training at issue." 29 C.F.R. § 38.9(d).

Additionally, the regulations prohibit certain actions that would undermine meaningful access. For example, recipient entities "shall not require an LEP individual to provide their own interpreter" or "rely on an LEP individual's…family or friends to interpret" except where "the information conveyed is of minimal importance." 29 C.F.R. § 38.9(f)(1), (2)(ii). Even then, the recipient "must make and retain a record of the LEP individual's decision to use their own interpreter." *Id.*

As a whole, the WIOA regulations provide specific guidance that recipients can use to meet their language access obligations. This regulatory regime was not cut from whole cloth, but rather incorporated two previously existing sources. First, WIOA superseded an earlier workforce development statute, the Workforce Investment Act ("WIA") of 1998, which incorporated identical anti-discrimination language. *See* 29 U.S.C. § 2938. WIA's implementing regulations required state UI agencies to "take reasonable steps to provide services and information in appropriate languages" based on the scope of the program and the size of the LEP population to be served.

16

29 C.F.R. § 37.35. Second, the WIOA regulations implemented federal policy guidance that had delineated recipients' language obligations since 2000.

### c.    Federal Policy Guidance

Like the regulations detailed above, agency guidance requiring federal funding recipients to provide "meaningful access" to LEP individuals has proven durable through the vicissitudes of electoral politics.

In 2000, the DOJ elaborated the connection between language and national origin. As the DOJ explained:

> …[T]he failure to address language barriers may not be simply an oversight, but rather may be attributable, least in part, to invidious discrimination on the basis of national origin and race….[O]ften language does serve as an identifier of national origin. The same sort of prejudice and xenophobia that may be at the root of discrimination against persons from other nations may be triggered when a person speaks a language other than English.

Enforcement of Title VI of the Civil Rights Act of 1964—National Origin Discrimination Against Persons with Limited English Proficiency; Policy Guidance, 65 Fed. Reg. 50123, 50124 (Aug. 16, 2000). Here, the DOJ took a cue from the U.S. Supreme Court:

> 'Language elicits a response from others, ranging from admiration and respect, to distance and alienation, to ridicule and scorn. Reactions of the latter type all too often result from or initiate racial hostility * * *. It may well be, for certain ethnic

17

groups and in some communities, that proficiency in a particular language, like skin color, should be treated as a surrogate for race under an equal protection analysis.'

*Id.* (quoting *Hernandez v. New York*, 500 U.S. 352, 370 (1991) (plurality opinion)).

Having set out the conceptual connection, the DOJ then moved to more specific guidance. Interpreting the above-referenced 28 C.F.R. § 42.405(d)(1) and 28 C.F.R. § 42.104(b)(1)(iv), the DOJ set forth a four-factor analysis to determine whether a recipient has taken "reasonable steps to ensure meaningful access:" (1) the number or proportion of LEP persons in the eligible service population; (2) the frequency with which LEP individuals come in contact with the program; (3) the importance of the service the program provides; and (4) the recipient's available resources. *Id.* Clarifying that fulfilling these obligations is not a passive activity, the DOJ "requires recipients to identify LEP persons with whom it has contact." Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons, 67 Fed. Reg. 41455, 41465 (June 18, 2002).

The DOJ guidance imposes requirements that would later be mirrored in the WIOA regulations: notice to LEP people that free translation and

18

interpretation services are available, *id.*, quality translation of "vital" documents, *id.* at 41463, and free, timely, and accurate interpretation that does not rely on an LEP person's family members. *Id.* at 41456, 41461–62.

Applying its corresponding non-discrimination regulation, *see* 29 C.F.R. § 31.3(b)(1)(iv), the DOL in 2003 incorporated the DOJ guidance and provided additional unemployment-specific context. *See* Policy Guidance to Federal Financial Assistance Recipients Regarding the Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons, 68 Fed. Reg. 32290, 32295–99 (May 29, 2003).

The DOL reinforced this guidance with program letters to state UI officers. Agency staff should "identify language access barriers," "provide affected claimants alternative access options," "ensure that individuals with known language needs are identified," and "ensure…that future vital program communications occur in the appropriate language for that individual (including claimant decisions/determinations, notices of right to appeal, and appeal decisions)." DOL, Wage and Hour Division, Unemployment Insurance Program Letter 02-16 (October 1, 2015) ("UIPL 02-

19

16"), 10.[3] Such measures are not voluntary; the DOL requires state UI administrators to "ensure that processes exist or are implemented to provide all claimants access to UI benefits." *Id.* at 14. The DOL reiterated these language access requirements during the pandemic. UIPL 02-16, Change I (May 11, 2020), 3.[4]

### d. Deference

The DOJ and DOL regulations are entitled to *Chevron* deference, and agency guidance is entitled to *Auer* deference. As such, the interpretation of national origin discrimination to include the denial of language access measures is controlling. *See Berndsen v. N. Dakota Univ. Sys.*, 7 F.4th 782, 784, n. 3 (8th Cir. 2021) (giving "controlling weight" to Title IX regulations and related agency interpretations).

*Chevron* deference "is appropriate when it appears that Congress delegated authority to the agency generally to make rules carrying the force

---

[3] *Available at*
https://www.dol.gov/agencies/eta/advisories/unemployment-insurance-program-letter-no-02-16

[4] *Available at*
https://www.dol.gov/sites/dolgov/files/ETA/advisories/UIPL/2020/UIPL_02-16_Change-1.pdf

Appellate Case: 22-2831    Page: 28    Date Filed: 12/19/2022 Entry ID: 5228614

of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *Beeler v. Astrue*, 651 F.3d 954, 959 (8th Cir. 2011). As in *Beeler*, the relevant regulations are the product of notice-and-comment rulemaking and within the bounds of the statutory rulemaking authority. *See id.*

The only questions, then, are "whether Congress has spoken to the precise question at issue" and, if not, whether the agencies' interpretation "is based on a permissible construction of the statute." *Glover v. Standard Fed. Bank*, 283 F.3d 953, 961 (8th Cir. 2002). Importantly, "the agency's view governs if it is a reasonable interpretation of the statute—not necessarily the only possible interpretation, nor even the interpretation deemed *most* reasonable by the courts." *Beeler*, 651 F.3d at 959.

Here, Congress has not defined national origin discrimination or its connection to language services in Title VI or WIOA, thereby leaving a "gap for the agency to fill." *Glover*, 283 F.3d at 961. To that end, the WIOA regulations define national origin discrimination to include "treating individual beneficiaries, participants, or applicants for any aid, benefit, service, or training under any…program or activity adversely because they (or their families or ancestors) are from a particular country or part of the

21

world, because of ethnicity or accent (including physical, linguistic, and cultural characteristics closely associated with a national origin group), or because the recipient perceives the individual to be of a certain national origin, even if they are not." 29 C.F.R. § 38.9(a). The regulation sensibly ties the broad concept of national origin to some of its identifiable attributes, including appearance and language. And, uncontroversially, the regulation equates discrimination to adverse treatment. This is no grand leap from the statutory text.

Regarding specific language access requirements, the DOJ and DOL have taken Title VI's prohibition on "be[ing] excluded from participation in" federally funded programs as the starting point. DOJ's long-standing Title VI regulation acknowledges that language services are necessary for people "effectively to be informed of or to participate in the program." 28 C.F.R. § 42.405(d)(1). DOL's WIOA regulation takes the same basic tack, positing "meaningful access" as a counterpoint to exclusion. 29 C.F.R. § 38.9(b). These formulations recognize a simple truth: people cannot effectively or meaningfully participate in a program they do not understand.

At the same time, the regulations provide sufficient flexibility to fit funding recipients' circumstances. Namely, recipients' obligations are

limited to taking "reasonable steps" as determined by "the scope of the program and the size and concentration of such population" needing services. 28 C.F.R. § 42.405(d)(1). Meanwhile, the WIOA regulations, while noting that "each LEP individual served" is entitled to meaningful access, also require recipients to take only "reasonable steps." 29 C.F.R. § 38.9(b). To this end, the WIOA regulations require translation of "vital information" "for languages spoken by a significant number or portion of the population eligible to be served" and allow verbal communication of the same information "for languages not spoken by a significant number or portion." 29 C.F.R. § 38.9(g)(1)–(2).

In sum, the regulations reflect a textual and practical reasonableness that surmounts *Chevron's* second step. The agencies' interpretations of these regulations through guidance documents pass a similar test.

*Auer* deference requires courts to "give deference to an agency's interpretation of its own regulations, if the regulations are ambiguous." *Chalenor v. Univ. of N. Dakota*, 291 F.3d 1042, 1046 (8th Cir. 2002) (granting "controlling deference" to guidance stating that "limiting men's teams in pursuit of equalizing athletic opportunities between the sexes is consistent with Title IX"). Where a regulation's text allows multiple interpretations,

23

deference is accorded to "any reasonable construction," "even though [the agency's] interpretation might not be the best or most natural one by grammatical or other standards." *Id.*

The DOJ and DOL guidance documents interpret two ambiguous terms. First, mirroring the regulations, they construe "national origin discrimination" to include denial of language access services needed to participate in programs. Second, providing shape to the regulations, they clarify the "reasonable steps" recipients must take to ensure meaningful access. The guidance construes both terms in ways that reflect the textual and practical reasonableness contained in the regulations.

An anti-discrimination regime fleshed out through regulations and guidance is not new to the Eighth Circuit. In the Title IX context—essentially identical to Title VI with the substitution of "sex" for "race, color, or national origin"—this Court in 2021 accorded controlling deference to a similar combination of agency actions imposing affirmative obligations on regulated entities.

In *Berndsen*, a women's college ice hockey team sued under Title IX to prevent the college from eliminating it while keeping the men's team. 7 F.4th at 783. The team based its suit on a 1979 guidance document interpreting

24

Title IX and its implementing regulations to require that universities sponsor a separate team for contact sports in specified situations. *Id.* at 784–86. Sanctioning terms not appearing in Title IX's text, the Court deferred to regulations requiring universities to "provide equal athletic opportunity for members of both sexes," which included an assessment of whether "the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes." *Id*. Deferring once more, the Court held that the 1979 document interpreting "effective accommodation" to affirmatively require a women's team was a valid basis for a suit and reversed the district court's dismissal. *Id.*

The regulations and guidance here operate analogously. Like *Berndsen's* "equal athletic opportunity" and "effective accommodation," "reasonable steps" and "meaningful access" serve as broad legal standards with their contours further defined through more specific instructions. Thus, the deference due is the same. *See also Chalenor*, 291 F.3d at 1050; *Maricopa Cty., Ariz.*, 915 F. Supp. 2d at 1080 (applying *Auer* deference to DOJ's Title VI language access guidance).

Given the cemented connection between national origin discrimination and language access denials, DWS's repeated deprivations of

25

language measures "excluded [Murguía] from participation in" and "denied [her] the benefits of" the UI program.

## II. Murguía created a triable inference of discrimination through evidence of repeated language service denials and misconduct by an agency worker with a known history of discrimination.

Even with national origin discrimination encompassing language access denials, Title VI provides a private right of action only for intentional discrimination. *Alexander*, 532 U.S. at 281 (2001). To establish a Title VI claim, the plaintiff "must show that race, color, or national origin motivated the defendant's discriminatory conduct." *Rowles v. Curators of Univ. of Missouri*, 983 F.3d 345, 355 (8th Cir. 2020).

In the absence of direct evidence of discrimination, courts apply the Title VII *McDonnell Douglas* framework to Title VI claims. *Rowles*, 983 F.3d at 355. Generally, this requires a plaintiff to show that they (1) are a member of a protected class; (2) suffered an adverse action; (3) were qualified to receive the benefits or services of the relevant program; and (4) were treated differently from similarly situated persons outside the protected class. *See id.* Once the plaintiff establishes a prima facie case through these four elements, "the burden shifts to the defendant to proffer a legitimate, nondiscriminatory reason for its decision." *Id.* Then, "[i]f the defendant

26

proffers such a reason, the burden shifts back to the plaintiff to show that the proffered reason was mere pretext for discrimination." *Id.*

Recognizing that discrimination does not obey the niceties of sharply drawn legal standards, the Eight Circuit characterizes the prima facie showing as a "flexible evidentiary standard" that was "never intended to be rigid, mechanized, or ritualistic." *Lewis v. Heartland Inns of Am., L.L.C.*, 591 F.3d 1033, 1039 (8th Cir. 2010).

### a.      Prima Facie Showing

The first three elements are not in serious dispute. Murguía is an immigrant from Mexico who speaks no English (**App.VI**, 2324; **R.Doc. 165**, 9). As DWS subsequently determined, she was qualified to receive UI benefits. (**App.III**, 1096; **R.Doc. 130-3**, 178). And, she experienced multiple adverse actions in the year-long delay in receiving benefits, the loss of $1,800 otherwise available, and subsequent fraud proceedings. (**App.I,** 257–265, 328–30; **III**, 1030–36; **R.Doc. 130**, 5–13; **130-1**, 56–58; **130-3**, 112–18).

With respect to the fourth element, evidence shows that Spanish-speaking LEP individuals face unique barriers not encountered by English speakers. As described below, Murguía received only three out of 22 written notices with "vital information" in Spanish—roughly 14%. *Infra* at 32–34.

27

Further, she was never provided an interpreter in her office visits and had unreliable access to Spanish services on the phone. *Infra* at 35–38. Thus, unlike English-speaking claimants seeking the same benefits, she was denied critical information in an intelligible language and deprived of the ability to interact effectively with DWS.

Agency documents show that Murguía's experience as an LEP person was no aberration. One spreadsheet contains 41 complaints from English-speaking claimants from all service areas over a three-and-a-half-year span from December 2017 to April 2021. (**App.I**, 99–110; **R.Doc. 97-2**, 1–12). The spreadsheet mentions claimants wanting to file unspecified complaints against particular offices or workers, complaining of rudeness, and inquiring about different benefit programs. Meanwhile, DWS produced emails reflecting around 20 complaints from Spanish-speaking individuals or DWS workers serving them over the roughly one-year span of April 2020 to May 2021. (**App.I**, 75-98, 111–120; **R.Doc. 97-1**, 1–24; **97-3**, 1–10). The complaints differ in both frequency and kind. Namely, all the Spanish-speaking individuals' complaints reflect *fundamental access issues*: not receiving language assistance from local offices, the inability to reach DWS's LEP Coordinator, receiving incomprehensible letters in English, DWS workers

28

having difficulty finding interpreters, the agency's interpreter directory being out of date, and claimants' use of informal interpreters.

Such comparative data is sufficient to create a triable issue about meaningful access. In *Segal,* a disabled user of public transit sued the local transit agency pursuant to the Americans with Disabilities Act ("ADA")[5] and Rehabilitation Act after its buses repeatedly failed to stop appropriately. 29 F.4th at 402–03. The district court granted summary judgment to the defendants. *Id.* Reversing, the Eighth Circuit held that the complaints by disabled individuals compared to complaints of non-disabled individuals created a material dispute about whether "[the transportation agency] provided meaningful access" and whether disabled individuals were "more likely to experience poor service than a non-disabled rider." *Id.* at 405. Noting that "the question of whether Segal was provided meaningful access… is a fact-intensive issue…to be determined by a jury," the Court also instructed that "evidence of a potential violation of a [federal agency] regulation is a factor to be weighed by the jury tasked with deciding whether an entity or business provided…individuals meaningful access to its

---

[5] The ADA uses a similar formulation as Title VI but substitutes "disability" for "race, color, or national origin." *See* 42 U.S.C. § 12132.

services." *Id.* The *Segal* court's language applies equally to Murguía's situation and comparative evidence.

Even if this were not enough, "[c]omparative evidence is certainly not the exclusive means by which a plaintiff may establish an inference of discrimination." *Lewis*, 591 F.3d at 1040. Indeed, "[p]laintiffs may satisfy the fourth element through other types of evidence." *Id.* In all circumstances, "[t]he touchstone inquiry remains whether circumstances permit a reasonable inference of discrimination." *Id.*

The *Arlington Heights* framework provides a method for discerning such inferences. *See Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–68 (1977). It requires "a sensitive inquiry into such circumstantial and direct evidence as may be available." *Id.* at 266. As summarized by the Eighth Circuit, the analysis examines:

> [T]he totality of the relevant facts, including racially discriminatory impact, historical background, the sequence of events leading up to the challenged decisions, and legislative or administrative history, especially contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports.

*Mensie v. City of Little Rock*, 917 F.3d 685, 689 (8th Cir. 2019) (citing *Arlington Heights*, 429 U.S. at 265–68 (1977)).

30

When examining this totality, "[a]dherence to a particular policy or practice with full knowledge of the predictable effects…is one factor among many others which may be considered by a court in determining whether an inference of…intent should be drawn." *Columbus Bd. of Ed. v. Penick*, 443 U.S. 449, 465 (1979).

Here, DWS's persistent failure to provide appropriate translation and interpretation, the agency's system-wide language access deficiencies, and the mistreatment by the DWS worker create an inference of intent sufficient to proceed to a jury.

### i. Translation Denials

To start, DWS concedes in its Language Access Plan and Operations Manual that all federal language access requirements apply and that the Spanish-speaking LEP population is the agency's most frequently encountered LEP group. (**App.III** 921–29, 958–61, 982; **R.Doc. 130-3**, 4–12, 33–43, 64).

DWS's persistent violations of federal mandates and internal policies deprived Murguía of "meaningful access" to UI benefits. While Murguía maintains that her need for Spanish communications was apparent from early April 2020, it is undisputed that DWS definitively knew of Murguía's

31

need for Spanish no later than 9/23/20. (**App.II** 433–35; **R.Doc. 130-1**, 161–63). Nonetheless, DWS "adhered to a practice" of communicating with her in English.

All documents in the record that DWS sent to Murguía qualify as "vital documents" that DWS must translate. (**App.I**, 256–64; **II**, 423–26; **III**, 877–90, 928–29, 1042–1132; **R.Doc. 130**, 4–12; **131-1**, 151–54; **130-2**, 284–97; **130-3**, 10-11, 124–214).

Still, DWS has no Spanish translation for three of the most critical forms despite recognizing them as vital since 2017: Notice of Monetary Determination (AAS-508), the Notice of Agency Determination (AAS-578), and the fraud-related Notice of Agency Determination (FIRE-578). (**App.III**, 928-29, 958-61; **R.Doc. 130-3**, 10–11, 40–43). Those three forms were sent to Murguía at least 10 times, each containing different information. (**App.III**, 1041, 1051, 1057–58, 1095–96, 1106–07, 1127–30; **R.Doc. 130-3**, 123, 133, 139–40, 177–78, 188–89, 209–12). Presently, DWS has no way of communicating this written information to claimants in Spanish. All DWS offers in Spanish is boilerplate language with an unhelpful instruction to go to a local office for help translating. (Id.; **App.III**, 891-94; **R.Doc. 130-2**, 298–301). The

Appellate Case: 22-2831    Page: 40    Date Filed: 12/19/2022 Entry ID: 5228614

important information—appeal deadlines and instructions, findings of fact, and applicable law—goes untranslated.

Even where DWS has translated vital documents, the agency failed to send them to Murguía. Although Spanish versions exist, (**App.III**, 928–29; **R.Doc. 130-3**, 10–11), she received the following 12 documents in English after 9/23/20:[6] five Appeal Tribunal Notices of Telephone Hearing (no form number), one Appeal Tribunal Decision of Hearing Officer (no form number), two General—Claimant Statement forms (AAS-525Q1C), two Claimant Statement—Incorrect Reason for Separation forms (AAS-525F1C), and two Interview Notice forms (FIRE-BLO2). (**App. III**, 877–80, 883–84, 1065–66, 1089–93, 1101–04, 1131–32; **R.Doc. 130-2**, 284–87, 290–91; **130-3**, 147–48, 171–75, 183–86, 213–14; **35-2,** 12).

Of the roughly two dozen forms DWS sent Murguía, only three have been in Spanish: one Interview Notice form (FIRE-BLO2) and two Notices of Telephone Hearing. (**App.III,** 881–82, 885–86, 1121–22; **R.Doc. 130-2**, 288–89, 292–93, **R.Doc. 130-3**, 203–04). The latter two were sent only after Murguía's

---

[6] DWS disputes knowing of Murguía's language needs before 9/23/20. So, vital documents sent before then in English despite extant Spanish translations are omitted.

Appellate Case: 22-2831    Page: 41    Date Filed: 12/19/2022 Entry ID: 5228614

attorney requested an interpreter. (**App.III**, 895; **R.Doc. 130-2**, 302). Even then, the resulting decision was in English. (**App.III**, 887–90; **R.Doc. 130-2**, 294–97). And, the tiny tagline on some forms—which states "interpretation/translation services available through your local office" in Spanish[7]—does not provide a phone number to call or state that language services are provided free of charge. (**App.II**, 436–37; **R.Doc. 130-1**, 164–65).

DWS was put on notice of Murguía's need for Spanish communications at least seven times. On 9/23/20, DWS's LEP Coordinator Corina Parra spoke with her in Spanish on the phone. (**App.II**, 433–35; **R.Doc. 130-1**, 161–63). On 11/3/20, daughter Alejandra emailed Parra and stated that her mom "doesn't understand what [the form] is asking." (**App.I**, 349; **R.Doc. 130-1**, 77). On 12/18/20, Murguía filed suit with an explicit request for Spanish services as relief. (**App.I**, 28–31; **R.Doc. 2**, 28–31). On 2/18/21, Murguía submitted a form stating, "I was not provided information in Spanish" and "I do not speak English fluently." (**App.III**, 1089; **R.Doc. 130-3**, 171). On 2/22/21, Murguía's attorney told DWS in writing that "Ms. Murguía requires that documents be sent to her in

---

[7] This tagline is called a "Babel notice." 29 C.F.R. § 38.4(i).

Appellate Case: 22-2831    Page: 42    Date Filed: 12/19/2022 Entry ID: 5228614

Spanish" and asked DWS to "note this information in your system and provide her appropriate Spanish-language services." (**App.III**, 1091; **R.Doc. 130-3**, 173). On 4/7/21, Murguía responded to a fraud notice and wrote, "I do not speak or read English" and "I am completing this form with help." (**App.III**, 1119; **R.Doc. 130-3**, 201). On 4/23/21, the District Court stated, "The Court expects that at this point…DWS…is following the applicable procedures for communicating with Ms. Murguía" in Spanish. (**R.Doc. 47**, 25–26).

Yet, as of 9/13/21, Murguía's file did not contain any indication that she required services in Spanish. (**App.II**, 433–34; **VI**, 2062–65; **R.Doc. 130-1**, 161–62; **136-16**, 98–101). This is pointedly unexplained.

### ii.    Interpretation Denials

DWS's translation failures are mirrored by similar interpretation failures during Murguía's office visits, phone calls, and hearings.

Murguía had two office visits featuring undisputed violations. On 4/2/20 and 8/26/20, Murguía and her daughter Alejandra went to the Fayetteville office, spoke Spanish in front of the caseworkers, were not offered interpretation, and were not provided any information in Spanish—

35

not even the UI handbook with program rules.[8] (**App.I**, 257–60, 284–86; **II**, 359–65, 379–82; **III**, 776; **R.Doc. 130**, 5–8; **130-1**, 12–14, 87–93, 107–10; **130-2**, 183). On both occasions, the workers failed to complete the two forms DWS's Operation Manual requires when an LEP person uses a family interpreter. (Id.; **App.III**, 1034–36; **R.Doc. 130-3**, 116–18).

Murguía's third in-office visit ultimately resulted in the denial of *timely* interpretation and translated documents. (**App.II**, 371–78, 386–88; **III**, 767–72, 928–29, 1108–14; **R.Doc. 130-1**, 99–106, 114–16; **130-2**, 174–79; **130-3**, 10–11, 190–96). On 4/22/21, Murguía went with Alejandra to the Fayetteville office to present her ID for verification and address a problem filing a weekly claim. They requested an interpreter from the front desk worker, who then went somewhere else for about 10 minutes, returned, told them that it would take some time, and did not provide an estimated wait time. Because Murguía and Alejandra had work and could not wait indefinitely, Murguía signed three forms in English allowing Alejandra to interpret and providing

---

[8] The subsequent fraud allegation stemmed from the lack of effective DWS communication. While waiting for DWS to determine her eligibility, Murguía obtained a part-time job working 10 to 15 hours per week. As she was not receiving any UI benefits at the time and had not been given the program rules, she did not know she was required to report this minimal income. (**App.III**, 887–89; **R.Doc. 130-2**, 294–96).

Appellate Case: 22-2831     Page: 44     Date Filed: 12/19/2022 Entry ID: 5228614

claim information. All three were "vital documents" that the agency had translated into Spanish, but Spanish versions were not offered. Alejandra was not able to fully interpret the English versions. They left within 20 minutes of first speaking with the front desk worker. The Fayetteville office never contacted LEP Coordinator Parra that day for interpretation. (**App.II**, 460; **R.Doc. 130-1**, 188).

The sole instance where Murguía sought help by email also evinces lack of timely assistance. On 11/3/20, after Murguía received two forms in English in the mail, Alejandra emailed Parra, their only Spanish-speaking agency contact. (**App.I**, 349; **R.Doc. 130-1**, 77). Alejandra asked Parra to "help [Murguía] fill [the forms] out because she doesn't understand what it's asking." Parra did not reply to that email until 12/15/20, forcing Murguía to rely on Alejandra to complete the forms on time.

The phone was not a reliable source of prompt assistance. Parra admitted that she "had an excess of calls" and "sometimes [was] not able to return phone calls until the next day." (**App.II**, 415; **R. Doc. 130-1**, 143). Murguía called Parra several other times and would sometimes get a return call, sometimes not. (**App.I**, 316–17, 327; **III**, 766; **R.Doc. 130-1**, 44–45, 55; **130-2**, 173). Indeed, e-mails to Parra from other LEP individuals sent between

37

April 2020 and May 2021 demonstrate claimants' difficulties getting in touch with Parra or otherwise accessing Spanish-language services. *Supra* at 28–29.

DWS has no phone alternatives to Parra. DWS does not provide a specific phone number to call for claimants who require interpretation. (**App.II**, 448; **R.Doc. 130-1**, 176). Indeed, as recently as 3/24/22, Murguía needed Alejandra's help to change her address over the phone. (**App.III**, 872; **R.Doc. 130-2**, 279).

Finally, Murguía's 1/31/22 telephone hearing about fraud was plagued with interpretation problems. (Id.). She had trouble communicating through the interpreter when he was present. Then, interpretation suddenly stopped before the hearing was complete and was not restored.

### iii.    System-wide Deficiencies

Murguía's experience reflects broad system-wide failings in DWS's language access practices. Responsibility for LEP services resides in Parra, whose duties include ensuring compliance with federal obligations, interpreting directly, training staff on language access, and monitoring LEP services. (**App.II**, 405–08; **R.Doc. 130-1**, 133–36). Despite her mandate, Parra's authority is limited: she does not supervise anyone directly, has no formal input on staff evaluations, is not involved in hiring decisions, has no

38

budget, and has no control over LEP-related expenditures. (**App.II**, 417–421; **R.Doc. 130-1**, 145–49).

DWS lacks interpretation capacity. As of 3/4/21, DWS had only four certified Spanish interpreters on staff, including Parra. (**App.II**, 442–46; **III**, 998; **R.Doc. 130-1**, 170–74; **130-3**, 80). Interpretation and translation are secondary to each staff member's primary job functions, such as working the English-language UI hotline. None of the certified interpreters were based in DWS's Fayetteville office at the time of Murguía's visits even though that office serves the highest number of Spanish-speaking people. (**App.II**, 703; **III**, 954–55; **R.Doc. 130-2**, 110; **130-3**, 36–37).

Within the given capacity, DWS does not organize its interpreters to ensure availability. DWS does not assign interpreters to be available during specific times or track interpreter availability. (**App.II**, 443–53; **R.Doc. 130-1**, 171–81). Field office staff are simply instructed to call through the list of agency interpreters and, if none are reached, to send an email to an internal interpreter list. (Id.; **App.III**, 987; **R.Doc. 130-3**, 69). Although outside vendors are technically available, the Fayetteville office has never used one since the present manager started in 2015. (**App.II**, 706–09; **R.Doc. 130-2**, 113–16).

39

DWS further lacks procedures to deliver timely language services. As Murguía's office visit and the assorted emails to Parra show, interpreters are not always available right away. DWS does not track in-office wait times and has not adopted any guidelines about acceptable wait times for clients before using outside vendors. (**App.II**, 450–453; **R.Doc. 130-1**, 178–81). Clients are forced to simply wait with no information about when they will be served, if at all.

Notably, these deficiencies are not new. After a 2015 on-site investigation into DWS's language access practices, the DOL issued a letter in 2016 finding that DWS had not:

(1) Effectively identified the language needs of the LEP population it services.

(2) Developed an appropriate language access plan to meet the needs of the LEP population it serves.

(3) Provided adequate training to staff on the agency's language access obligations and how to provide language assistance.

(4) Provided adequate interpretation services in a timely manner to LEP individuals.

(5) Provided adequate translation services in a timely manner.

(6) Provided LEP individuals with appropriate notice of language assistance services.

40

(**App.II**, 681–89; **R.Doc. 130-2**, 88–96). As a result, DWS entered a settlement agreement with the DOL in 2017. (**App.II**, 679; **R.Doc. 130-2**, 86). In 2019—without an actual site visit—the DOL reviewed some documentation that DWS submitted and determined DWS to have fulfilled the terms of the settlement agreement. (**App.IV**, 1311; **R.Doc. 136-3**, 1). The DOL did not opine on DWS's broader compliance with Title VI or WIOA.

Moreover, DWS's efforts in response to the DOL investigation do not remediate agency leadership's professed hostility to language access measures. While negotiating the 2017 settlement, one DWS executive couched the requirement to improve language services in nakedly nationalistic terms, writing "This is so unAmerican." (**App.VI**, 2205–07; **R.Doc. 145-1**, 1–3). Evidently, Spanish-speaking claimants are not part of this official's America. Aside from illustrating the connection between national origin and language, the comment evinces discriminatory intent. Such hostility further casts doubt on DWS's commitment to meaningful improvement and the efficacy of any reforms.

### iv.   Mistreatment by DWS Worker

Raymond "Rick" Michaud's actions towards Murguía on 8/26/20 support an inference of intent. DWS put Michaud at the front desk of the

41

Fayetteville office to handle "whatever [claimants] were needing addressed." (**App.II**, 695; **R.Doc. 130-2**, 102). Murguía came that day with paystubs from her last employer, which would have corrected erroneous information in DWS's system and established her eligibility. (**App.I**, 259–61, 284–86, 290–96, 304–05, 359–65; **III**, 774–76, 1003; **R.Doc. 130**, 7–9; **130-1**, 12–14, 18–24, 32–33, 87–93; **130-2**, 181–83; **130-3**, 85). Michaud refused to accept the paystubs. He told her no other benefits were available. He failed to offer an interpreter. And, he treated her badly, with Alejandra and Murguía emphasizing his angry facial expressions and harsh tone of voice. He did this while running a SAVE immigration database check on her even though her immigration status had been established before and was not in question. (**App.III**, 1044–46, 1061–62; **R.Doc. 130-3**, 126–28, 143–44). To top it off, he did not note the interaction in Murguía's service file despite DWS's policy requiring him to do so. (**App.II**, 736–42; **III**, 1030–36; **R.Doc. 130-2**, 143–49; **130-3**, 112–18). The immediate effect was to deprive Murguía of access to UI benefits and leave her and Alejandra with no idea about what to do next.

DWS management was on notice of Michaud's antagonism to Spanish-speaking people and other discriminatory behavior through past complaints

42

about his treatment of LEP individuals, his past abuse of co-workers, and his activities as president of an outlaw motorcycle gang with racist beliefs.

### A. Past Mistreatment of LEP Individuals

Michaud was the office manager of DWS's Rogers and Siloam Springs offices when complaints from Spanish-speaking LEP individuals about the Rogers office prompted the 2015 DOL investigation. (**App.II**, 674–75, 681–89; **R.Doc. 130-2**, 81–82, 88–96).[9] Both DWS's Deputy Director, Ron Snead, and Equal Opportunity Manager, Gloria Johnson, received the DOL's 2016 findings letter and were included in settlement discussions. (**App.II**, 679–80; **R.Doc. 130-2**, 79–80).

Michaud's subordinates testified about the bleak reality of LEP services during Michaud's tenure as manager. Employee-1,[10] a Spanish-speaking, Hispanic employee working in the Rogers office in 2015, testified that Michaud would have a "really mad face" and loud tone when the lobby was filled with Hispanic people. (**App.VII**, 2597–2603, 2625–26; **R.Doc. 131-**

---

[9] Michaud was a manager when he left DWS in 2016. He returned to DWS in a non-managerial role in April 2020. (**App.III**, 789–91; **R.Doc. 130-2**, 196–98).

[10] To protect the identities of former subordinates mistreated by Michaud, the District Court entered a protective order requiring designations of Employee-1, Employee-2, etc. **(R. Doc. 96)**.

Appellate Case: 22-2831     Page: 51     Date Filed: 12/19/2022 Entry ID: 5228614

**1**, 220–26, 248–49). He publicly scolded her multiple times for helping Spanish-speaking LEP claimants with forms. (**App.VII**, 2603–09, 2625–26; **R.Doc. 131-1**, 226–32, 248–49). Employee-1 informed Michaud of various problems for Spanish-speaking LEP claimants: excessive wait times, using informal interpreters, and being forced to choose between leaving or signing English documents without understanding. (**App.VII**, 2610–24, 2631; **R.Doc. 131-1**, 233–47, 254). After she also informed a Little Rock official of these problems, Michaud allowed her to do some interpretation but did not report the problems to the regional manager or take any other steps to improve LEP services. (Id.). Indeed, he did not even pass out a list of interpreters to staff until he announced the DOL investigation. (**App.VII**, 2627–28; **R.Doc. 131-1**, 250–51). Even then, Employee-3, a different Rogers employee working at that time, testified that "it seemed pretty obvious that [Michaud] did not want us to" call interpreters. (**App.VIII**, 2712–13, 2732–34; **R.Doc. 131-2**, 14–15, 34–36). Rather than use interpreters, Michaud directed Employee-3 to serve Spanish-speaking LEP individuals even though she did not speak Spanish. (Id.).

44

When Employee-1 filed a sexual harassment complaint against Michaud in September 2015, she specifically mentioned his language access practices:

> As a native Spanish speaker who can read and write in Spanish, I was often used to assist clients on the phone…I notified Rick that Spanish-speaking clients were not being served fairly…sometime in May or June. On another instance, while on a conference call…, I notified Pam Francis that Spanish-speaking clients being asked to sign documents without explanation. If they didn't sign, they would have to make a new appointment and bring an interpreter. Pam then told Rick that she could report it, but it was best to follow chain of command since he had prior notification of the situation.

(**App.VII**, 2679; **R.Doc. 131-1**, 302). She also included a timeline containing information about these practices. (**App.VII**, 2680–2688; **R.Doc. 131-1**, 303–11). The complaint went to the Equal Opportunity Manager, who sent it to DWS's then-Director, Daryl Bassett. (**App.VII**, 2677; **R.Doc. 131-1**, 300). Regional Manager and Michaud's supervisor, Doyce Hill, and DWS's Deputy Director also received this complaint. (**App.VII**, 2690–91; **R.Doc. 131-1**, 313–14).

Once Michaud learned of the complaint, (Id.), he retaliated against Employee-1 by limiting services in Spanish. He stopped her from helping an

45

LEP client complete a form, discouraged her from helping co-workers requesting interpretation, and forbade her from interpreting or helping LEP clients. (**App.VII** 2642–47, 2652–59; **R.Doc. 131-1**, 265–70, 275–82). In response, Employee-1 communicated with the Equal Opportunity Manager about a retaliation complaint and mentioned that she was no longer providing language services. (**App.VII**, 2655–56, 2672–73; **R.Doc. 131-1**, 268–69, 295–96).

Management ignored Michaud's role in language access deprivations. DWS never noted anything in Michaud's personnel file about this. (**App.V**, 1853–72; **R.Doc. 136-14**, 1–20). Moreover, DWS has no documents showing any internal investigation into Michaud's language access practices. (**R. Doc. 109-2**, 3).

### B.  Abuse of Subordinates

DWS management had ample reason to know of the broader risk Michaud posed through his rampant abuse of subordinates. After filing her complaint in September 2015, Employee-1 left four months later due to mistreatment and retaliation. (**App.VII**, 2647–49; **R.Doc. 131-1**, 270–72). Employee-2 filed a sexual harassment complaint in 2013 and left the same year. (**App.VIII**, 2896–2900, 2951–55; **R.Doc. 131-2**, 198–202, 253–57).

46

Employee-3 filed an age discrimination complaint against Michaud in October 2015 and left in 2016. (**App.VI**, 2226–28; **VIII**, 2705–07, 2716–31; **R.Doc. 145-3**, 1–3; **131-2**, 7–9, 18–33). Employee-4 reported Michaud's bullying and mistreatment to her direct supervisor and explained that she needed counseling as a result. (**App.XI**, 3740–47; **R.Doc. 137-8**, 3–10). She left in 2014 or 2015. (Id.). Employee-5 worked in the Rogers office from 2012 to 2015, throughout which time Michaud would have sex with her during work hours on DWS property. (**App.VIII**, 2754, 2760–63, 2769; **R.Doc. 131-2**, 56, 62–65, 71). The mistreatment forced her out. (Id.).

Documents and testimony from DWS officials confirm management knew of Michaud's discrimination. The Regional Manager, the Equal Opportunity Manager, the Deputy Director, and the Director all knew Employee-1 and -2 filed complaints. (**App.VII**, 2677, 2690–91; **VII**, 2896–2900, 2951–55; **R.Doc. 131-1**, 300, 313–14; 131-2, 198–202, 253–57). Employee-3 informed the Regional Manager and the Equal Opportunity Manager of her complaint. (**App.VI**. 2226–28; **VIII**, 2707, 2728–31; **R.Doc. 145-3**, 1–3; **131-2**, 9, 30–33). The Regional Manager recalled complaints about Michaud involving at least Employee-1 and Employee-5 and confirmed that all complaints were passed onto the Deputy Director. (**App.XI**, 3926, 3936–37,

47

3941; **R.Doc. 137-10**, 6, 16–17, 21). The Equal Opportunity Manager sent all complaints she received to the Director and Deputy Director and directed complainants' follow-up inquiries to the Deputy Director. (**App.XI**, 3841, 3847–48; **R.Doc. 137-9**, 92, 98–99). In addition to specific notice, Michaud's mistreatment of all five employees was severe enough to be noticed by other employees. (**App.I**, 270–71; **VII**, 2634, 2663–67; **VIII**, 2708–11, 2714–15, 2742–47, 2754–59, 2953; **R.Doc. 131**, 18–19; **131-1**, 257, 286–290; **131-2**, 10–13, 16–17, 44–49, 56–61, 255). His abuse was plainly visible.

Still, DWS never investigated adequately. (**App.I**, 270–272; **R.Doc. 131**, 18–20). Employee-3 wrote two months after filing her initial complaint to ask, "has anything become of my grievance letter?" (**App.VI**, 2228; **R.Doc. 145-3**, 3). Employee-1's complaint generated a one-page memo from the Equal Opportunity Manager to DWS's Director with no further response. (**App.VII**, 2677; **R.Doc. 131-1**, 300).

Unsurprisingly, Michaud faced no consequences. In fact, the Equal Opportunity Manager and Deputy Director signed Michaud's rehire paperwork in April 2020 despite knowing of his role in language access denials and co-worker abuse. (**App.III**, 1000; **R.Doc. 130-3**, 82).

48

## C.  Outlaw Motorcycle Gang Activities

In 2007, Michaud founded and became president of the Western Arkansas chapter of the Sons of Silence, an outlaw motorcycle gang. (**App.III**, 808; **R.Doc. 130-2**, 215). Members are often known to display racist insignia like swastikas, "SS" (Schutzstaffel) lightning bolts associated with Nazi Germany, and "white pride" text on hats, shirts, other clothing items, and tattoos. (**App.III**, 831, 834; **R.Doc. 130-2**, 238, 241). Michaud's vice president and the chapter's former "enforcer"—roles typically appointed by the president—publicly displayed a swastika neck tattoo on Facebook. (**App.III**, 801, 809, 851–56; **R.Doc. 130-2**, 208, 216, 258–63). Other members publicly displayed a Sons of Silence shirt with "SS" lightning bolts, freely used the "n word," posted white pride-related content, and made anti-immigrant posts. (**App.III**, 851–66; **R.Doc 130-2,** 258–73). For his own part, Michaud admitted to using the "n word." (**App.III**, 805; **R.Doc. 130-2**, 212).

These are not distant associates. Michaud calls them "brothers" and rides with them regularly, including to a rally in Sturgis, South Dakota in August 2021 and on a trip to St. Louis in 2019 or 2020. (**App.III**, 799–804, 870; **R.Doc. 130-2,** 206–11, 277). As president, he maintains regular contact with all members, ensures compliance with mandatory dues, meeting, and ride

49

requirements, and directs recruitment activities. (**App.III**, 829–30; **R.Doc. 130-2**, 829–30).

Michaud mixed his Sons of Silence business with DWS. (**App. VIII**, 2749, 2765-68, 2951–55; **R.Doc. 131-2**, 51, 67–70, 253–57). Employee-5 saw a Sons of Silence recruit at the Rogers DWS office multiple times and testified that the recruit "was always running and like doing little things for [Michaud]." She said that Michaud's motorcycle gang activity "was just kind of the known thing throughout the office." Michaud showed Employee-2 photos of himself in his motorcycle club vest along with nude photos of women he slept with on his motorcycle trips. More generally, Michaud spoke about motorcycles and trips to Sturgis. This evidence creates a material dispute about DWS's knowledge of Michaud's gang involvement and related racism.

### v. Conclusion on Prima Facie Case

Murguía presented robust evidence to support an inference of discrimination based on language access: complaints showing Spanish-speaking LEP individuals had access problems distinct from English-speaking individuals, persistent denials of language services despite DWS's knowledge that she needed them, ongoing system-wide language access

50

deficiencies, and a DWS executive's comment that language services were "unAmerican."

This evidence bears out the obvious differences faced by LEP individuals. An English-speaking person seeking services at a DWS office does not require a family member to enable communication with the agency. The only wait time is to get to the front of the line, not an additional, indefinite wait for an interpreter who may never appear. An English-speaking person has a clear number to call for services and, again, must wait only as long as it takes for someone to answer. An English-speaking person receives "vital" notices in a language they understand. And, while an English-speaking person may hire counsel, they do not need attorneys to ensure that basic information will be conveyed in an intelligible language. The whole process may still be difficult for an English-speaking person—it so often is—but the process is free from these *additional barriers* specifically tied to Murguía's language and national origin.

Additionally, the mistreatment by Michaud was no surprise to DWS. Management knew that this former manager had caused widespread language service denials, routinely discriminated against co-workers, and mixed outlaw motorcycle gang activities with work. Discriminatory

51

treatment was a "predictable effect" of placing him in a position to interact with members of the public.

### b.    Pretext

DWS did not substantiate a legitimate reason for its actions. Its vague references to the pandemic do not connect to the language access deprivations Murguía experienced. Thus, there is a material dispute on pretext.

Murguía may show that a stated reason "was pretext for unlawful discrimination in a number of ways." *Liles v. C.S. McCrossan, Inc*., 851 F.3d 810, 821 (8th Cir. 2017). First, "[i]t is possible for strong evidence of a prima facie case to establish pretext." *Id.* Second, she can "point to [e]vidence that similarly situated employees outside [her] class were treated differently." *Id.* Third, she "may show that the employer's explanation is unworthy of credence...because it has no basis in fact." Or, fourth, she "may show pretext by persuading the court that a [prohibited] reason more likely motivated the employer." *Id.* The first and second ways are analyzed above. *Supra* at 27–51. Presently, Murguía focuses on the third way.

DWS's invocation of the pandemic as broadly affecting customer service (**App.IV**, 1154; **R.Doc. 136**, 22) "is unworthy of credence" because

52

any pandemic-related difficulties are unconnected to the treatment Murguía endured. DWS's failure to provide Murguía translated documents has no legitimate connection to the pandemic, especially where the agency was told several times that she needed translations. *Supra* at 34–35. DWS did not adopt any pandemic-related changes to its language services, instead reaffirming existing practices in an updated April 2021 Language Access Plan. (**App.III,** 949, **VI**, 2001–04; **R.Doc. 130-3**, 31; **136-16**, 37–40). Moreover, DOL sent DWS guidance in May 2020—early in the pandemic—emphasizing existing language access requirements. *See* UIPL 02-16, Change 1, p. 3–4.

Leaving translation aside, Murguía's complaints about her office visits are based not on long lines, but on the agency's refusal to provide interpreters and Michaud's mistreatment of her. *Supra* at 36–37. On Murguía's first two office visits in April 2020 and August 2020, DWS never even offered an interpreter. This contravened DWS's practices and Operations Manual. Meanwhile, the issue in Murguía's third office visit in April 2021 was that DWS did not provide an interpreter or an estimated wait time within 20 minutes of her arrival at the front desk. DWS has not explained this delay, and nothing suggests the pandemic affected

53

interpretation services a year after its onset. In fact, DWS did not contact LEP Coordinator Parra—usually the agency's first option for interpretation—or any third-party interpreters. Nor does the pandemic explain why DWS forced Murguía to sign documents in English that had been translated into Spanish.

With respect to Michaud's mistreatment in August 2020, pandemic-related pressures on DWS staffers do not justify refusing to take documents, failing to record the encounter, giving false information that other benefits were not available, or running the unwarranted SAVE immigration database check. In fact, DWS management confirmed that the proper procedure during the pandemic was to take all documents offered by a claimant and note every encounter. (**App.II**, 737–38; **R.Doc. 131-2**, 144–45). Pandemic-specific unemployment benefits had been available for several months, foreclosing any notion that he was unfamiliar with them. *See* 15 U.S.C. § 9021. And, DWS's attempt to couch the SAVE immigration search as valid is belied by ample evidence that Murguía's immigration status was already established. (**App.V**, 1952–54; **R.Doc. 136-15**, 80–82). DWS's standard procedure was to verify her status around the time of her application, and, indeed, her name was on a list to have a SAVE search run on 4/11/20.

54

(**App.V**, 1611, 1852, 1945–46; **VI**, 2262–65; **R.Doc. 136-10**, 2; **136-13**, 1; **136-15**, 73–74; **146**, 26–29). That timing coincides with DWS scanning her immigration card on 4/11/20. (**App.III**, 1044–46; **R.Doc. 130-3**, 126–28). And, there is no evidence of any backlog in SAVE searches that persisted into August. (**App.V,** 1948–51; **R.Doc. 136-15**, 76–79). Moreover, it is not credible to think that Michaud just happened to be working through a backlog while working the front desk *at the very moment* that DWS's sign-in sheets show Murguía was there. (**App. III**, 1003, 1062; **R.Doc. 130-3**; 85, 144). The reasonable explanation is that he ran the SAVE check while she was present with him but refused to assist her because of his prejudice.

### c.  The District Court's Weighing of Evidence

The District Court agreed that Murguía received inadequate services but impermissibly weighed evidence in determining that "an astounding confluence of errors, compounded by the pandemic's effect on agency workload and operations, caused the various obstacles Ms. Murguía encountered—not animus." (**App.VI**, 2332; **R.Doc. 165**, 17). This act of attributing Murguía's experience to other factors overlooked "the totality of the relevant facts" supporting a triable inference of discrimination.

55

The District Court's approach is first reflected in its analysis of disparate treatment that Murguía and other Spanish-speaking LEP individuals received. Referring to the comparative evidence outlined above, *supra* at 28–29, the District Court stated:

> The Court agrees with Ms. Murguía that the emails reflect LEP individuals struggling to access services and resources in Spanish. The emails, as evidence, may put DWS on notice of that fact, as well as demonstrate that DWS's existing service model requires some modification. But the emails do not reflect an agency indifferent to serving the LEP population. Many contain a response from Ms. Parra asking the claimant to call her for assistance or indicate that she has contacted someone within DWS to resolve an issue. Others originate with a non-Spanish speaking DWS employee seeking help on behalf of an LEP individual.

(**App.VI**, 2339–40; **R.Doc. 165**, 24–25). Here, the trial court makes two related errors. One, it discounts as evidence of intent the widespread agency practices that create the exclusion that Murguía and others experienced. Put differently, a DWS that did not intend to discriminate would not have such widespread barriers in the first place. Two, having overlooked the system-wide exclusion, the District Court conflated individual employees' efforts to respond to the exclusion with broader agency intent. Particularized efforts to help individuals access DWS's services, even if done beneficently, are

56

required *because* the system is unnavigable. In this light, the employees' efforts are further evidence of discrimination, not absolution from it.

The District Court continued similarly when analyzing DWS's failure to send Murguía translated notices, writing:

> DWS does not adequately explain why it continued to send Ms. Murguía forms in English when a Spanish version was available. This is perhaps the strongest evidence of intentional discrimination Ms. Murguía cites.
>
> …
>
> Here, DWS's continued provision of forms in English is clearly problematic. But it appears, first, to primarily impact claimants that apply in person, and second, to be a function of the agency's out-of-date computer system rather than discriminatory intent.
>
> …
>
> Based on this record, the Court can infer that DWS's system does not reliably ensure that Spanish-speaking clients will receive information in Spanish. The agency appears constrained by outdated technology and too few interpreters.

(**App.VI**, 2343–45; **R.Doc. 165**, 28–30). Here, the District Court attributed the agency's failings to causes that even DWS did not, as the agency never referenced technology or computer system deficiencies in its summary judgment briefing. (**App.IV**, 1133–57; **R.Doc. 136**). Moreover, the record lacks evidence to support the assertion.

57

The court's opinion is unclear about the technological limitations it posits. At first, the trial court takes limited information about DWS's online application system and its case management system to seemingly imply that a Spanish-speaking LEP claimant can only receive notices if the initial application is in Spanish or flagged as needing Spanish. (**App.VI**, 2344–45; **R.Doc. 165,** 29–30). But, the court then concedes that "[i]t is not clear…whether any method exists to provide Spanish speakers with Spanish-language forms if they do not initially apply through EZARK." (Id.). This discourse obscures and contradicts the LEP Coordinator's testimony that DWS staff could indicate the need for Spanish through a note in the service file. (**App.VI**, 2062–65; **R.Doc. 136-16**, 98–101). What is more, the district court does not acknowledge that DWS *never* made such a note for Murguía. The agency's failure to do so is amplified by the seven instances where DWS irrefutably knew of Murguía's need. *Supra* at 34–35.

There are three more errors in the District Court's analysis regarding technology. One, the court did not acknowledge that several "vital documents" have never been translated into Spanish. *Supra* at 32–33. No system can send a Spanish notice that does not exist. Two, the court did not acknowledge the possibility that, if DWS's systems cannot generate the

extant Spanish forms on their own, agency workers could manually print and send them. Three, the court overlooked that any computer system limitations failing to provide "meaningful access" to LEP people can also be evidence of discrimination. That is, DWS used technology knowing that it frustrates language access rather than facilitating it, thereby excluding large swaths of eligible claimants. Thus, like with the individual remedial efforts above, what the court posits as a defense actually substantiates the inference of discrimination.

Moving on, the District Court weighed evidence regarding the DOL's 2015 investigation and DWS's subsequent response. The court states that DWS's settlement-mandated remedial measures "render[] the relationship between DWS's 2015 LEP policy—and any prior discrimination against the LEP population—and the agency's 2020 practices much weaker." (**App.VI**, 2352; **R.Doc. 165**, 37). However, the trial court did not note that Murguía faced in 2020 the same problems the DOL found in 2015. The persistent shortcomings are evidence that DWS's response was inadequate. Moreover, whatever improvements might have been made did not eliminate persistent system-wide deficiencies, including the lack of interpreters and Parra's lack

Appellate Case: 22-2831     Page: 67     Date Filed: 12/19/2022 Entry ID: 5228614

of budgetary and supervisory authority. A jury could reasonably infer intent from these persistent failures.

Turning to Michaud, the District Court improperly weighed evidence regarding management's knowledge of his discriminatory behavior, writing:

> Nor does [Murguía] show that DWS officials knew Mr. Michaud previously discriminated against LEP individuals and failed to institute corrective measures.
>
> …
>
> With respect to Mr. Michaud specifically, the DOL investigation clearly put DWS on notice of LEP issues in the offices managed by him. Perhaps the agency should have investigated Mr. Michaud's individual role in creating those issues, in addition to the system-wide changes it adopted. But, as it is, the evidence does not demonstrate DWS possessed knowledge about Mr. Michaud that the DOL settlement agreement and subsequent remedial measures would not have addressed.
>
> …
>
> The Court cannot fathom why the agency rehired Mr. Michaud in 2020. His behavior was appalling—and so was DWS's response. But this does not provide evidence relevant to Ms. Murguía's claim of intentional discrimination based on national origin.

(**App.VI,** 2349–52; **R.Doc. 165**, 34–37). Here, the District Court overlooked that Employee-1's 2015 complaint against Michaud for sexual harassment plainly described Michaud's role in denying Spanish-language services. *Supra* at 45–46. Thus, DWS management knew of Michaud's discriminatory practices against Spanish-speaking LEP people through two independent sources: the employee's complaint and the DOL investigation.

Likewise, the District Court discounted that DWS knew more generally that Michaud was prone to discrimination because at least three additional employees made written or verbal complaints to DWS management. Michaud's open use of a gang recruit to run errands from the Rogers office also put DWS on notice. The combined evidence creates a triable issue about DWS's intent when it tasked Michaud with front-line public interaction with predictably discriminatory effects.

Lastly, the District Court weighed evidence with respect to Murguía's April 2021 visit. Here, the court summarily concluded that, "[w]hile Ms. Murguía did ultimately leave without receiving interpretation assistance, 15 minutes is not so unreasonable as to suggest intentional discrimination." (**App.VI**, 2341; **R.Doc. 165**, 26). This overlooks that she was not provided an estimated wait time and was forced to sign documents in English without

61

understanding them when Spanish versions were available. *Supra* at 37. As the *Segal* court noted, "whether [a plaintiff] was provided meaningful access within the context of state or federal law is a fact-intensive issue, and one that is to be determined by a jury." 29 F.4th at 405. The combined circumstances of this visit are enough to conclude that DWS failed to provide meaningful access, especially when considered with the other evidence.

Indeed, the combined evidence underscores the overarching error of the District Court. It parsed discrimination into fine categories and discrete events without considering that the *totality* of all that Murguía experienced deprived her of meaningful access. Over two years, she could not access benefits effectively in person or in writing. That is too long a time with too many unexplained instances of exclusion to prevent Murguía from trying her case to a jury.

### d. Conclusion on Triable Inference

Discrimination has evolved from the time Title VI was originally adopted. As the Eighth Circuit recognizes, "explicit, inculpatory evidence of discriminatory intent is rare." *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 776 (8th Cir. 1995). Accordingly, plaintiffs can establish the requisite intent through the *McDonnell Douglas* framework and the *Arlington Heights*

62

analysis. Murguía has presented extensive evidence—entitled to all reasonable inferences at summary judgment—of persistent language access violations and hostile treatment. Demanding even more to bring a case to a jury renders Title VI meaningless, granting the possibility of relief only to those who suffer the most overt manifestations of discrimination.

**III.    The District Court committed reversible error when it declined to assess intentional discrimination through the deliberate indifference standard.**

While applying *McDonnell Douglas* and *Arlington Heights*, (**App.VI**, 2333–35; **R.Doc. 165**, 18–20), the District Court rejected Murguía's urging to infer intent from DWS's deliberate indifference to language access denials and Michaud's behavior. (**R.Doc. 2, 15, 24, 41, 129, 145**). Whether a court applied the proper legal standard is a question of law entitled to *de novo* review. *Karsjens v. Lourey*, 988 F.3d 1047, 1050 (8th Cir. 2021).

The standard is warranted here because it (1) is not inherently limited to Title IX or Title VI peer-on-peer harassment claims; (2) reflects the remedial nature of Title VI; and (3) makes sense under the present factual scenario.

In discrimination claims, the deliberate indifference standard infers intent from an entity's "own decision to remain idle in the face of known"

63

mistreatment. *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 641 (1999) (applying the standard to a determine a school district's liability under Title IX for student-on-student sexual harassment); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 291 (1998) (teacher-on-student sexual mistreatment). These decisions recognize that entities with "some control" over a discriminatory situation are obligated to stop it and that failure to do so can be discriminatory. *Davis*, 526 U.S. at 644.

Though *Davis* and *Gebser* are premised on Title IX, the distinction with Title VI is not relevant here. First, the statutes are structurally identical. *Compare* 20 U.S.C. § 1681 *with* 42 U.S.C. § 2000d. Second, Congress has equalized the available remedies. *See* 42 U.S.C. § 2000d-7. Third, the Supreme Court has stated that "[t]he two statutes operate in the same manner…" *Gebser*, 524 U.S. at 286. And, finally, the Supreme Court has resolved legal questions by analogizing freely between them. *See Cannon v. Univ. of Chicago*, 441 U.S. 677, 706-708, n. 41 (1979) (administrative exhaustion requirements).

While many circuits have invoked *Davis* and *Gebser* to extend the standard to Title VI claims involving inadequate school response to race-based harassment between students, *see, e.g.*, *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 408 (5th Cir. 2015), the logic of deliberate indifference is

64

not cabined to the school environment. Conceptually, there is no reason why a government agency administering critical benefits should be any freer to be indifferent to mistreatment experienced by its clients than a school is to that experienced by its students, be them minors or adults. *See, e.g.*, *Grandson v. Univ. of Minnesota*, 272 F.3d 568, 575 (8th Cir. 2001).

Implicitly acknowledging that *Davis* and *Gebser* are not so limited, the Third Circuit has adopted deliberate indifference as part of a Title VI framework for stopping discrimination beyond peer-to-peer harassment. *See Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 272 (3d Cir. 2014) (applying the standard to plaintiff's Title VI claim alleging that the school discriminated based on race through disproportionate placement of Black students in special education). Acknowledging Title VI's "remedial goals," the Third Circuit adopted the standard in part because individuals who discriminate "sometimes do not leave a trail of direct evidence" and attempt to "cover their tracks." *Id.* at 275.

Though largely unaddressed in the Title VI context, the remedial approach exemplified in *Blunt* is reflected in the use of deliberate indifference to analyze disability discrimination claims under the Rehabilitation Act and ADA, including in the Eighth Circuit. *See, e.g.*, *S.H. ex*

65

*rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 262 (3d Cir. 2013); *Meagley v. City of Little Rock*, 639 F.3d 384, 389 (8th Cir. 2011); *Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001); *Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 347 (11th Cir. 2012).

*Liese* best exemplifies the justification. There, the Eleventh Circuit reversed summary judgment on a Rehabilitation Act claim against a plaintiff with a hearing impairment who was denied a sign-language interpreter while in a hospital's emergency room. 701 F.3d at 337. First acknowledging the "backdrop" of the hospital's interpreter policy, an earlier lawsuit for denied interpreters, and a hospital training session, the court then recited a series of interactions spanning admission and an overnight stay where the plaintiff could not effectively communicate with her medical providers and was denied information about the nature of and reasons for the given treatments. *Id.* at 337–340. The Eleventh Circuit ultimately justified the deliberate indifference standard by referencing "the two principal purposes" of anti-discrimination laws articulated in *Gebser*: "to avoid the use of Federal funds to support discriminatory practices and to protect citizens against discriminatory practices." *Id.* at 348. Applying the standard, the court found that the plaintiff had presented sufficient evidence that at least

66

one of the attending doctors knew of the lack of interpretation, had the authority to order interpretation, and did not do so. *Id.* at 351.

The facts from *Liese* map neatly onto Murguía's case, with the "backdrop" of federal mandates and state policies accompanied by DWS's knowledge of Murguía's needs and its ongoing failure to meet them.

Applied here, deliberate indifference would alter the outcome, and the District Court erred in refusing to apply it.

## IV. Conclusion

Murguía has presented sufficient evidence to create a triable inference that DWS discriminated against her based on her national origin. While agreeing that DWS failed to adequately serve her, the District Court improperly weighed evidence to attribute DWS's failures to non-discriminatory causes. Accordingly, the District Court's order granting summary judgment should be reversed.

Appellate Case: 22-2831    Page: 75    Date Filed: 12/19/2022 Entry ID: 5228614

Dated: December 19, 2022

Respectfully Submitted,

By: *Trevor Hawkins*

Trevor Hawkins
Kevin De Liban (2012044)
Trevor Hawkins (2017224)
Jaden Atkins (2020128)

LEGAL AID OF ARKANSAS
310 Mid-Continent Plaza, Ste. 420
West Memphis, AR 72301
P: (800) 967-9224 x. 2206
F: (870) 732-6373
kdeliban@arlegalaid.org

68

**Certificate of Service**

I, Trevor Hawkins, certify that, on December 19, 2022, I electronically filed the foregoing Brief with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system.

*/s/ Trevor Hawkins*

69

## Certificate of Compliance

Pursuant to Federal Rule of Appellate Procedure 32, I, Trevor Hawkins, state that the applicable portions of this brief contain 12,986 words in proportionally sized 14-point Book Antiqua font. The brief was prepared in Microsoft Office Word for Microsoft 365 and has been scanned for viruses and is virus free.

*/s/ Trevor Hawkins*