# IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

_____

### Case No. 22-2831
_____

**María Murguía**
**Appellant**

**vs.**

**Charisse Childers, in her official capacity as Director of Arkansas Division of Workforce Services**
**Appellee**

_____

**On Appeal from the United States District Court**
**for the Western District of Arkansas**
**Case No. 5:20-cv-5221**
**The Honorable Timothy L. Brooks,**
**the United States District Judge**

_____

## BRIEF OF APPELLEE CHARISSE CHILDERS, IN HER OFFICIAL CAPACITY AS DIRECTOR OF ARKANSAS DIVISION OF WORKFORCE SERVICES
_____

**TIM GRIFFIN**
**Attorney General**
**State of Arkansas**

Maryna O. Jackson, No. 2009111
Senior Assistant Attorney General
Arkansas Attorney General's Office
323 Center Street, Suite 200
Little Rock, AR 72201
Tel. (501) 683-3296

## SUMMARY OF THE CASE AND WAIVER OF ORAL ARGUMENT

This Title VI case arises out of a claim for unemployment benefits ("UI"). Defendant Charisse Childers is sued in her official capacity as Director of the Arkansas Division of Workforce Services ("DWS"), the state agency responsible for UI administration. (Appellant's App. 1, Vol. I; R. Doc. 2). Appellant María Murguía ("Murguía") alleges DWS intentionally discriminated against her as a Spanish-speaking Mexican immigrant in violation of Title VI of the Civil Rights Act, 42 U.S.C. § 2000d. *Id.* After the completion of discovery, both parties moved for summary judgment. (Appellant's App. 2355, Vol. VI; R. Doc. 165). The Court granted DWS' motion for summary judgment and denied Murguía's motion for summary judgment. (Add 40; Appellant's App. 2355, Vol. VI; R. Doc. 165, at 40). Appellant does not appeal the denial of her motion for summary judgment. Instead, she alleged that the Court should reverse the District Court's decision granting DWS' motion for summary judgment and this case should proceed to trial. *Id.*

The facts and legal arguments are adequately presented in the record and briefs, and the Court's decisional process would not be significantly aided by oral argument. Fed. R. App. P. 34(a)(2)(C). Thus, Appellee waives oral argument.

ii

# TABLE OF CONTENTS

Summary of the Case and Waiver of Oral Argument ................................... ii

Table of Contents ......................................................................... iii

Table of Authorities ........................................................................v

Jurisdictional Statement ...................................................................x

Statement of the Issues ................................................................. xi

Statement of the Case ....................................................................1

Summary of the Argument ..............................................................2

Argument ......................................................................................8

    I.     Standard of review..........................................................8

    II.    The District Court correctly granted summary judgment in favor of
         DWS ...............................................................................8

        A.  Plaintiff's failure to demonstrate intentional discrimination
            based on language or national origin ...................................9

        B.  Title VI implementing regulations and DWS' policies ........... 12

        C.  Deference to regulations not warranted ................................. 17

    III.   Murguía failed to show that she was subjected to intentional
         discrimination under Title VI....................................................... 21

        A.  Language access deficiencies did not show intentional
            discrimination......................................................................... 23

            1.  Murguía's encounter with DWS on April 2, 2020...... 24

            2.  Interpreters' availability ............................................. 26

Appellate Case: 22-2831    Page: 3    Date Filed: 03/16/2023 Entry ID: 5256001

3.   Translation of vital documents......................................... 29

B.   Conduct attributed to Mr. Michaud.......................................... 32

IV.   The District Court correctly found that Murguía's failure to identify any comparators was fatal to her claims under Title VI.. 35

A.   DWS not notified of discrimination through Mr. Michaud's personal life ................................................................................ 37

B.   A single SAVE search on August 26, 2020, is not evidence of discrimination.................................................................................... 38

V.   Conclusion.............................................................................................. 39

Certificate of Service  ............................................................................. 40

Certificate of Compliance  ...................................................................... 41

iv

# TABLE OF AUTHORITIES

## CASES

*Alexander v. Sandoval*,
532 U.S. 275 (2001)................................................................ xi, 9, 11, 34, 35

*Almendares v. Palmer*,
222 F.R.D. 324 (N.D. Ohio 2004) ................................................. 23

*Anderson v. Liberty Lobby, Inc.*,
106 S.Ct. 2505 (1986)........................................................................8

*Awnuh v. Pub. Hous. Agency of City of St. Paul*,
19-CV-2765 (ECT/TNL), (D. Minn. Dec. 3, 2019) ............................... 31, 32

*Baouch v. Werner Enterprises*, Inc.,
908 F.3d 1107 (8th Cir. 2018) ..................................................... 19

*Berndsen v. N. Dakota U. System*,
7 F.4th 782 (8th Cir. 2021) ........................................................ 20

*Bd. of the County Comm'rs v. Brown*,
117 S.Ct. 1382 (1997)............................................................... 11

*Blunt v. Lower Merion Sch. Dist.*,
767 F.3d 247 (3d Cir. 2014) ....................................................... 11

*Christensen v. Harris Cty.*,
529 U.S. 576, 120 S.Ct. 1655 (2000)............................................. 19

*Clark v. Runyon*,
218 F.3d 915 (8th Cir. 2000) ...................................................... 35

*Coeur Alaska, Inc. v. Se. Alaska Conservation Council*,
557 U.S. 261 (2009).............................................................. xi, 18

*Davis v. Scherer*,
468 U.S. 183, 104 S.Ct. 3012 (1984)............................................. 34

Appellate Case: 22-2831    Page: 5    Date Filed: 03/16/2023 Entry ID: 5256001

*De Baca v. United States*,
399 F. Supp. 3d 1052 (D.N.M. 2019) ........................................................... 19

*Doe v. Dardanelle Sch. Dist.*,
928 F.3d 722 (8th Cir. 2019) ....................................................... 10

*Frazar v. Gilbert*,
300 F.3d 530 (5th Cir. 2002) ....................................................... 30

*Frew v. Hawkins*,
540 U.S. 431 (5th Cir. 2002) ....................................................... 30

*Gardner v. Howard,*
109 F.3d 427 (8th Cir.1997) ....................................................... 24

*Gebser v. Lago Vista Indep. Sch. Dist.*,
524 U.S. 274 (1998).................................................................. 33

*Hasan v. Foley & Lardner LLP*,
552 F.3d 520 (7th Cir. 2008) ....................................................... 22

*Houston Gas. Co. v. Strata Corp.*,
915 F.3d 549 (8th Cir. 2019) .........................................................8

*Johnson v. Securitas Sec. Servs. USA, Inc.*,
769 F.3d 605 (8th Cir. 2014) ....................................................... 35

*King v. United States*,
553 F.3d 1156 (8th Cir. 2009) .........................................................9

*Lucke v. Solsvig*,
912 F.3d 1084 (8th Cir. 2019) ....................................................... 21, 22, 35

*Maislin v. Tennessee State U.*,
665 F. Supp. 2d 922 (M.D. Tenn. 2009) ....................................................... 11

*Meagley v. City of Little Rock*,
639 F.3d 384 (8th Cir. 2011) ....................................................... 10

Appellate Case: 22-2831    Page: 6    Date Filed: 03/16/2023 Entry ID: 5256001

*Mensie v. City of Little Rock*,
917 F.3d 685 (8th Cir. 2019) ........................................................ 22

*Mitchell v. Dakota Cnty. Soc. Servs.*,
959 F.3d 887 (8th Cir. 2020) ........................................................ 21

*Mohamed for A.M. v. Irving Indep. Sch. Dist.*,
300 F. Supp. 3d 857 (N.D. Tex. 2018) .......................................... 34

*Mumid v. Abraham Lincoln High Sch.*,
618 F.3d 789 (8th Cir. 2010) ................................................... xi, 23

*NAACP, W. Region v. Brennan*,
360 F. Supp. 1006 (D.D.C. 1973) ................................................. 13

*Pers. Adm'r of Mass. v. Feeney*,
442 U.S. 256 (1979) ....................................................................... 9

*Pierre v. S. Ct. of Pennsylvania*,
764 Fed. Appx. 178 (3d Cir. 2019) ............................................... 11

*Rashdan v. Geissberger*,
764 F.3d 1179 (9th Cir. 2014) ........................................................ 9

*Rodgers v. Univ. of Mo. Bd. of Curators*,
56 F. Supp. 3d 1037 (E.D. Mo. 2014) ........................................... 33

*Rodgers v. Curators of Univ. of Mo. Sys.*,
634 F. App'x 598 (8th Cir. 2015) .................................................. 33

*Ryther v. KARE 11*,
108 F.3d 832 (8th Cir. 1997) ........................................................ 23

*Santos v. Peralta Cmty. Coll. Dist.*,
2009 WL 3809797 (N.D. Cal. Nov. 13, 2009) ............................. 36

*Skidmore v. Swift & Co.*,
323 U.S. 134, 65 S. Ct. 161 (1944) .............................................. 19

Appellate Case: 22-2831    Page: 7    Date Filed: 03/16/2023 Entry ID: 5256001

*Strate v. Midwest Bankcentre, Inc.*,
398 F.3d 1011 (8th Cir. 2005) ...................................................... 23

*Tex. Dep't of Cmty. Affairs v. Burdine*,
450 U.S. 248 (1981)..................................................................... 22

*Thompson By & Through Buckhanon v. Bd. Of Special Sch. Dist. No. 1
(Minneapolis)*, 144 F.3d 574 (8th Cir. 1998) ...................................9

*Tusing v. Des Moines Indep. Cmty. Sch. Dist.*,
639 F.3d 507 (8th Cir. 2011) ................................................. 21, 22

*United States v. Mead Corp.*,
533 U.S. 218, 121 S. Ct. 2164 (2001)........................................ 18

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977)..................................................................... 21

*Z.B. v. Irving Indep. Sch. Dist.*,
3:17-CV-2583-B (N.D. Tex. June 28, 2019) ............................... 34

## STATUTES, RULES, AND FEDERAL REGULATIONS

15 U.S.C. § 9021 ........................................................................ 16

42 U.S.C. § 2000d ......................................................... ii, x, 1, 12

Fed. R. App. P. 34(a)(2)(c) .......................................................... ii

28 U.S.C. § 1291 ..........................................................................x

29 C.F.R. § 38.9 ..................................................... 14, 15, 25, 29

Exec. Order No. 13,
65 Fed. Reg. 50121 (Aug. 16, 2000) .......................................... 13

Dep't of Labor, Emp. & Training Admin., Unemployment Insurance
Program Letter No. 02-16 (Oct. 1, 2015) .................................... 15

Appellate Case: 22-2831    Page: 8    Date Filed: 03/16/2023 Entry ID: 5256001

Dep't of Labor, Emp. & Training Admin., Unemployment Insurance Program Letter No. 16-20 (Apr. 5, 2020).................................................... 17

Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons, 67 Fed. Reg. 41455-01 (U.S. Dep't of Justice June 18, 2002) ..................................................................................... 16

Policy Guidance to Federal Financial Assistance Recipients Regarding the Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons, 68 Fed. Reg. 32289 (U.S. Dep't of Labor May 29, 2003).............................................................. 13, 14

Appellate Case: 22-2831    Page: 9    Date Filed: 03/16/2023 Entry ID: 5256001

# JURISDICTIONAL STATEMENT

The District Court had federal question jurisdiction of Murguía's claim that DWS violated Title VI of the Civil Rights Act, 42 U.S.C. § 2000d. This appeal is from the District Court's Order of July 22, 2022, granting DWS's Motion for Summary Judgment and dismissing the case with prejudice. (App. VI, 2316–2356; R. Docs. 165, 170). Murguía filed her Notice of Appeal on August 18, 2022. This Court has appellate jurisdiction under 28 U.S.C. § 1291.

Appellate Case: 22-2831    Page: 10    Date Filed: 03/16/2023 Entry ID: 5256001

# STATEMENT OF THE ISSUES

**I.  THE DISTRICT COURT CORRECTLY DECLINED TO CHOOSE BETWEEN *CHEVRON* AND *SKIDMORE* BECAUSE THE CHOICE DID NOT AFFECT THE OUTCOME OF THE CASE.**

*Coeur Alaska, Inc. v. Se. Alaska Conservation Council*,
557 U.S. 261 (2009)


**II.  THE DISTRICT COURT CORRECTLY FOUND THAT APPELLANT FAILED TO SHOW SHE WAS SUBJECTED TO INTENTIONAL DISCRIMINATION UNDER TITLE VI.**

*Alexander v. Sandoval*, 532 U.S. 275 (2001)

*Mumid v. Abraham Lincoln High Sch.*, 618 F.3d 789 (8th Cir. 2010)


**III.  THE DISTRICT COURT CORRECTLY APPLIED INTENTIONAL DISCRIMINATION STANDARD TO THIS CASE.**

*Alexander v. Sandoval*, 532 U.S. 275 (2001)

*Mumid v. Abraham Lincoln High Sch.*, 618 F.3d 789 (8th Cir. 2010)

Appellate Case: 22-2831    Page: 11    Date Filed: 03/16/2023 Entry ID: 5256001

## STATEMENT OF THE CASE

Murguía filed this lawsuit alleging that DWS discriminated against her as a Spanish-speaking Mexican immigrant in violation of Title VI of the Civil Rights Act, 42 U.S.C. § 2000d. After the completion of discovery, both parties moved for summary judgment. (Add 40; Appellant's App. 2355, Vol. VI; R. Doc. 165, at 40). The Court granted DWS's motion for summary judgment and denied Murguía's motion for summary judgment. *Id*. Murguía filed this appeal. Appellant does not appeal the denial of her motion for summary judgment. (App. Br. 26). Instead, she alleged that the Court should reverse the District Court's decision granting DWS' motion for summary judgment and this case should proceed to trial. *Id.*

The District Court correctly found that Murguía cannot prevail on her claim of intentional discrimination under Title VI. (Add 40; Appellant's App. 2355, Vol. VI; R. Doc. 165, at 40). Therefore, the District Court correctly granted summary judgment in favor of DWS and correctly denied Murguía's motion for summary judgment. Id. This Court should affirm.

Appellate Case: 22-2831   Page: 12   Date Filed: 03/16/2023 Entry ID: 5256001

## SUMMARY OF THE ARGUMENT

### Background

Murguía is a lawful permanent resident, who came to the United States of America approximately 30 years ago. (Appellant's App. 1163, Vol. IV; R. Doc. 136-1). Before November of 2019, Murguía was employed as a housekeeper and cleaner at Molly Maid of Northwest Arkansas. (Appellant's App. 15, Vol. I; R. Doc. 2, at 15). From November of 2019, until March of 2020, she worked for Holiday Inn. (Appellant's App. 1, Vol. I; R. Doc. 2, at 1). In March of 2020, Murguía stopped working for Holiday Inn. *Id.*

On March 11, 2020, Governor Hutchinson signed Executive Order 20-03 declaring a state of emergency and confirmed the first presumptive case of Covid-19 in Arkansas.[1] Since that time, DWS has undertaken the unprecedented task of handling the historic number of unemployment cases filed in Arkansas. (Appellee's App. 169-171; R. Doc. 52, at 169-171). For example, in February of 2020, there were approximately 1,000 claims in the DWS' adjudication system. *Id.* By April of 2021, this number increased to approximately 60,000 claims. *Id.* The sheer volume is directly related to the Covid-19 pandemic. *Id.*

---

[1] *See* https://governor.arkansas.gov/images/uploads/executiveOrders/EO_20-03.1.pdf (last visited on January 20, 2023).

2

On or around April 8, 2020, Murguía and her 20-year old daughter, Alejandra, went to the Fayetteville DWS office and filed a claim for unemployment. (Appellant's App. 1189-90, Vol. IV; R. Doc. 136-1, at 32-33). Murguía alleged that she identified Holiday Inn as her employer. (Appellant's App. 1192, Vol. IV; R. Doc. 136-1, at 35). However, Murguía's unemployment application erroneously listed her next-to-last employer, Molly Maid of Northwest Arkansas, instead of her last employer, Holiday Inn. (Appellant's App. 3147, Vol. IX; R. Doc. 131-3, at 124). It also erroneously stated that Murguía's employment with Molly Maid started on November 13, 2019, and ended on March 09, 2020, due to "lack of work." *Id.*

On April 9, 2020, a Notice of Monetary determination was mailed to Murguía's home address. (Appellant's App. 3146, Vol. IX; R. Doc. 131-3, at 123). The Notice indicated that Murguía would be eligible for benefits and her benefit amount was determined by her employment at Molly Maid. *Id*. In relevant part, the notice stated in English and Spanish "interpretation/translation services available through your local office." *Id*. On June 10, 2020, DWS mailed a notice of determination disqualifying Murguía from receiving unemployment benefits. (Appellant's App. 3156, Vol. IX; R. Doc. 131-3, at 133). The determination was based on her application's erroneous reference to Molly Maid instead of Holiday Inn. *Id*.

Appellate Case: 22-2831    Page: 14    Date Filed: 03/16/2023 Entry ID: 5256001

Murguía appealed the decision disqualifying her from receiving unemployment. (Appellant's App. 1410, Vol. IV; R. Doc. 136-7, at 48).

<u>Murguía was represented by her counsel, Arkansas Legal Aid,<br>in her claim for unemployment benefits.</u>

Since July 23, 2020, Murguía has been represented by counsel, Legal Aid, in her unemployment claim. (Appellant's App. 1225, Vol. IV; R. Doc. 136-1, at 68). On July 24, 2020, Murguía sent a letter to the Arkansas Appeal Tribunal, withdrawing her appeal of the decision disqualifying her from unemployment benefits. (Appellant's App. 1227, Vol. IV; R. Doc. 136-1, at 70). Legal Aid helped Murguía prepare the July 24, 2020, letter, and told her to send it by facsimile. (Appellant's App. 1228, 1235, Vol. IV; R. Doc. 136-1, at 71-78). Murguía did not type the letter but received it in the mail. (Appellant's App. 1228, Vol. IV; R. Doc. 136-1, at 71). Murguía did not understand the words in the letter, and did not understand that she was withdrawing her appeal when she sent the letter to DWS. (Appellant's App. 1235-1238, Vol. IV; R. Doc. 136-1, at 78-81). Murguía can read in Spanish "very little." (Appellant's App. 1212, Vol. IV; R. Doc. 136-1, at 55). Murguía was simply told to fax this letter to DWS, and she did. *Id*.

Kesha Rogers Kelly, the Assistant Director of Unemployment Insurance ("UI") testified that if Murguía had simply proceeded with her appeal, the Appeal Tribunal would have referred the case back to the

4

adjudication department with the instructions to send the notice to the correct employer – Holiday Inn. (Appellee's App. 174-176; R. Doc. 52, at 174-176). Corina Parra ("Parra"), the UI Limited English Proficiency Coordinator, testified that Murguía told Parra she was advised by Legal Aid to withdraw her appeal and that Legal Aid simply gave her a form to fill out. (Appellee's App. 271; R. Doc. 52, at 271). Parra also testified that if Murguía had pursued her appeal, there would not have been any further delays concerning adjudicating Murguía's unemployment claim. *Id.*

In August of 2020, Murguía went to DWS' Fayetteville office for the second time. (Appellant's App. 1240-1241, Vol. IV; R. Doc. 136-1, at 83-84). Murguía brought a copy of her paychecks. *Id.* According to Murguía, Raymond Michaud ("Michaud") refused to make copies of her paychecks. *Id.* Murguía then sent paychecks to her attorneys. (Appellant's App. 1249, Vol. IV; R. Doc. 136-1, at 92). It was not until September 23, 2020, that Legal Aid contacted DWS with respect to Murguía's unemployment claim. (Appellee's App. 228-229; R. Doc. 52, at 228-229).

Starting on September 23, 2020, Legal Aid of Arkansas communicated with DWS regarding Murguía's unemployment claim. *Id.* However, until the filing of this lawsuit on December 18, 2020, at no time did Legal Aid notify DWS by email or in any correspondence that on August 25-26, 2020, Murguía

5

went to DWS' Fayetteville office. *Id*. Legal Aid did not notify DWS that any employee of DWS' Fayetteville office allegedly refused to scan copies of Murguía's paychecks. *Id*.

Murguía testified that Parra returned her phone calls, and if she could not call back the same day, she called back the next day. (Appellant's App. 1256-1259, Vol. IV; R. Doc. 136-1, at 99-102). Parra did not interrogate Murguía about the immigration status of other employees of Holiday Inn, but instead, Murguía volunteered this information to Parra. *Id*. Murguía does not have any problems with how Parra treated her, and other than one alleged interaction with Michaud in August of 2020, she was not mistreated by any other employee at DWS. (Appellant's App. 1259-1260, Vol. IV; R. Doc. 136-1, at 102-103).

On March 25, 2021, Murguía's UI was adjudicated. (Appellant's App. 3239, Vol. IX; R. Doc. 137-1, at 2). The monetary determination was mailed to Murguía, and she received all unemployment payments she was entitled to. *Id*. Murguía has applied and has received her Pandemic Unemployment Assistance ("PUA") benefits. (Appellant's App. 3362, Vol. IX; R. Doc. 137-2, at 21).

In April of 2021, Murguía went to DWS' Fayetteville office to provide a copy of her green card and driver's license. (Appellant's App. 1260-1261,

6

Vol. IV; R. Doc. 136-1, at 103-104). She was in the office for less than twenty minutes. *Id.* Murguía was offered an interpreter, but refused, because she was going to be late for work. *Id.* Murguía signed the documents authorizing her daughter, Alejandra, to interpret for her and left the office. (Appellant's App. 3323, Vol. IX; R. Doc. 137-1, at 87).

Procedural History

Murguía filed her lawsuit against DWS on [date]. (Appellant's App. 1, Vol. I; R. Doc. 2). DWS moved to dismiss, and the District Court denied the motion. (Appellant's App. 35, Vol. I; R. Doc. 37). Murguía moved for temporary restraining order and preliminary injunction, and after conducting an evidentiary hearing, the District Court denied preliminary injunctive relief. (Appellee's App. 1-310; R. Doc. 52, at 1-310). After the completion of discovery, both parties moved for summary judgment. (Appellant's App. 2355, Vol. VI; R. Doc. 165). The District Court denied Murguía's motion for summary judgment, and granted DWS' motion. *Id.* The case was dismissed with prejudice. (Appellant's App. 2356, Vol. VI; R. Doc. 170). Murguía filed this appeal. Based on the above, and for the reasons more fully explained below, this Court should affirm the District Court's judgment and dismiss this appeal.

## **ARGUMENT**

I.    Standard of review.

This Court reviews summary judgment *de novo*, applying the same standard as the trial court. *Houston Cas. Co. v. Strata Corp*., 915 F.3d 549, 551 (8th Cir. 2019). "Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id*. (internal punctuation and citation omitted). A dispute is "genuine" only if the plaintiff's evidence could cause a reasonable jury to return a verdict for it; a fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby*, Inc., 106 S.Ct. 2505, 2510 (1986). The plaintiff cannot rest upon mere allegations, but must present significant and specific probative facts in support of his complaint in order to defeat the motion. *Anderson*, 106 S.Ct. at 2510. Summary judgment may be affirmed for any reason supported by the record. *Houston Cas. Co*., 915 F.3d at 551.

II.   The District Court correctly granted summary judgment in favor of DWS.

The District Court correctly dismissed the Murguía's claims against DWS. (Appellant's App. 2356, Vol. VI; R. Doc. 170). Murguía has no evidence to support the only claim at issue in this appeal, which is whether

8

DWS engaged in intentional discrimination. This Court should affirm the District Court's order granting summary judgment in favor of DWS.

A.      Plaintiff's failure to demonstrate intentional discrimination based on language or national origin.

Title VI of the Civil Rights Act of 1964 provides a private right of action only for claims of intentional discrimination, not disparate impact. *See Alexander v. Sandoval*, 532 U.S. 275, 280 (2001). "To establish the elements of a prima facie case under Title VI, a complaining party must demonstrate that his/her race, color, or national origin was the motive for the discriminatory conduct." *Thompson By & Through Buckhanon v. Bd. of Special Sch. Dist. No. 1 (Minneapolis)*, 144 F.3d 574, 581 (8th Cir. 1998). While "discriminatory purpose" need not be the only motive, it "implies more than intent as volition or intent as awareness of consequences." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). Intentional discrimination, in other words, "implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.*

A plaintiff may establish intentional discrimination through either direct or indirect evidence. *See King v. United States*, 553 F.3d 1156, 1160 (8th Cir. 2009). "Direct evidence is evidence which, if believed, proves the fact of discriminatory animus without inference or presumption," *Rashdan v.*

9

*Geissberger*, 764 F.3d 1179, 1183 (9th Cir. 2014) (internal brackets omitted), and often consists of either an express classification based on race, color, or national origin, or a decisionmaker's express acknowledgment of discriminatory intent. Where "the plaintiff lacks evidence that clearly points to the presence of an illegal motive, he must avoid summary judgment by creating the requisite inference of unlawful discrimination through the *McDonnell Douglas* analysis, including sufficient evidence of pretext." *Griffith*, 387 F.3d at 736.

Murguía alleges that the District Court erred by declining to apply a deliberate indifference standard to her claims. (Appellant Br. at 17.) The District Court correctly found that Eighth Circuit applies the deliberate indifference standard for proving intentional discrimination in two types of claims: (1) those stemming from third-party harassment based on a protected characteristic, often in an educational setting, *see, e.g.*, *Doe v. Dardanelle Sch. Dist.*, 928 F.3d 722, 725 (8th Cir. 2019) (holding school district was liable under Title IX only if its deliberate indifference to prior reports of sexual assault effectively caused the discrimination against the plaintiff), and (2) those brought under the Americans with Disabilities Act of 1990 and the Rehabilitation Act of 1973, *see, e.g.*, *Meagley v. City of Little Rock*, 639 F.3d 384, 389 (8th Cir. 2011) (holding that deliberate indifference to the fact that a

given action will result in violation of federally protected rights may support an inference of discriminatory intent). Here, the case does not involve any ADA or Title IX claims. Therefore, the District Court correctly applied intentional discrimination standard adopted in *Sandoval*.

Assuming *arguendo* that Title VI deliberate indifference claims survived the Supreme Court's decision in *Sandoval*, Murguía failed to establish that DWS acted with deliberate indifference to her right to be free from discrimination based on national origin/language. *In Maislin v. Tennessee State U*., 665 F. Supp. 2d 922, 931 (M.D. Tenn. 2009), the court held that "'deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Id*., citing *Bd. of the County Comm'rs v. Brown,* 520 U.S. 397, 411, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). *See* also *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 272-73 (3d Cir. 2014) (holding that deliberate indifference requires actual as opposed to constructive knowledge). *See* also *Pierre v. S. Ct. of Pennsylvania*, 764 Fed. Appx. 178, 181 (3d Cir. 2019) (holding that the deliberate indifference standard has two parts, "requiring both (1) 'knowledge that a harm to a federally protected right is substantially likely,' and (2) 'a failure to act upon that likelihood.'").

11

The deliberate indifference must be a deliberate choice, rather than negligence or bureaucratic inaction. *Id*. In *Gebser* the Supreme Court "held that a Texas school district could not be held liable for damages based on a teacher's sexual molestation of a child because no one in authority knew of the molestation, and expressly rejected Title VI liability based on negligence, constructive notice, and respondeat superior." *Id.* (citing *Gebser*, 524 U.S. at 285–88).

Here, the District Court correctly found that Murguía failed to impute liability to DWS for any misconduct of Michaud. (Appellant's App. 2355, Vol. VI; R. Doc. 165). The District Court also correctly found that Murguía failed to show that any deficiencies in adjudication of her unemployment claim stemmed from discriminatory animus. *Id.* Nor could Murguía identify any comparators who were similarly situated to her and were treated differently by DWS. (Appellant's App. 2355, Vol. VI; R. Doc. 165). Therefore, District Court correctly dismissed this lawsuit as a matter of law. This Court should affirm.

B.    Title VI implementing regulations and DWS' policies.

Title VI of the Civil Rights Act of 1964 prohibits discrimination based on "race, color, or national origin . . . under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Congress authorized

12

federal agencies to effectuate the statute's core purpose by "issuing rules, regulations, or orders of general applicability"—and enforcing them. 42 U.S.C. § 2000d-1. Title VI "impose[s] upon Federal officials not only the duty to refrain from participating in discriminatory practices, but the affirmative duty to police the operations of and prevent such discrimination by State or local agencies funded by them." *NAACP, W. Region v. Brennan*, 360 F. Supp. 1006, 1012 (D.D.C. 1973). If a federal agency determines compliance cannot be achieved by "voluntary means," it may terminate federal financial assistance or pursue "any other means authorized by law," 42 U.S.C. § 2000d-1, which includes referral to the U.S. Department of Justice ("DOJ") to undertake civil prosecution, Title VI Coordination and Enforcement Memorandum (U.S. Dep't of Justice Aug. 19, 2010).

The Executive Branch has long interpreted discrimination based on national origin to encompass discrimination based on limited English proficiency. *See, e.g.*, Exec. Order No. 13,166, 65 Fed. Reg. 50121 (Aug. 16, 2000). To that end, the U.S. Department of Labor ("DOL") promulgates regulations that require federal funding recipients—including state UI agencies like DWS—to "take reasonable steps to ensure meaningful access to their programs and activities by LEP persons." Policy Guidance to Federal Financial Assistance Recipients Regarding the Title VI Prohibition Against

13

National Origin Discrimination Affecting Limited English Proficient Persons, 68 Fed. Reg. 32289 (U.S. Dep't of Labor May 29, 2003).

To assess compliance under this "flexible and fact dependent standard," the DOL balances: (1) the number or proportion of LEP persons served by the recipient; (2) the frequency with which LEP individuals come into contact with the recipient's program; (3) the nature and importance of the program; and (4) the resources available to the recipient and costs. *Id.* DOL regulations require recipients to "ensure that every program delivery avenue (e.g., electronic, in person, telephonic) conveys in the appropriate languages how an individual may effectively learn about, participate in, and/or access" UI benefits, 29 C.F.R. § 38.9(c), and "provide adequate notice to LEP individuals of the existence of interpretation and translation services and that these language assistance services are available free of charge," 29 C.F.R. § 38.9(e).

The regulations further specify that an accompanying adult may serve as an interpreter only "when the information conveyed is of minimal importance to the services to be provided or when the LEP individual specifically requests that the accompanying adult provide language assistance, the accompanying adult agrees to provide assistance, and reliance on that adult for such assistance is appropriate under the circumstances." 29 C.F.R. § 38.9(f)(2)(ii). "When the [agency] permits the accompanying adult to provide

14

such assistance, it must make and retain a record of the LEP individual's decision to use their own interpreter." *Id*. DOL guidance instructs that "UI agency staff should be trained to identify language access barriers and provide affected claimants alternative access options." Dep't of Labor, Emp. & Training Admin., Unemployment Insurance Program Letter No. 02-16, at 10 (Oct. 1. 2015).

The DWS Operations Manual incorporates these requirements. If "it appears a client has limited English proficiency, DWS staff must determine the language spoken and enlist an interpreter on the client's behalf," regardless of whether a formal request was made. (Appellant's App. 3093, Vol. IX; R. Doc. 131-3, at 70). As to document translation, DOL regulations require state agencies to "translate vital information in written materials into [commonly used languages] and make the translations readily available in hard copy, upon request, or electronically such as on a Web site." 29 C.F.R. § 38.9(g)(1). Vital information is defined as any "information, whether written, oral, or electronic, that is necessary for an individual to understand how to obtain any aid, benefit, service and/or training; necessary for an individual to obtain any aid, benefit, service and/or training; or required by law." 29 C.F.R. § 38.4(ttt). Communications containing vital information must contain a Babel notice, 29 C.F.R. § 38.9(g)(3), which is a short statement included in a document "in

15

multiple languages informing the reader that the communication contains vital information, and explaining how to access language services to have the contents of the communication provided in other languages." 29 C.F.R. § 38.4(i).

Furthermore, "once a recipient becomes aware of the non-English preferred language of an LEP beneficiary . . . , the recipient must convey vital information in that language." 29 C.F.R. § 38.9(h). The DOJ considers it "strong evidence" of regulatory compliance if the recipient "provides written translations of vital documents for each eligible limited English proficiency language group that constitutes five percent or 1,000, whichever is less, of the population of persons eligible to be served or likely to be affected or encountered." Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons, 67 Fed. Reg. 41455-01 (U.S. Dep't of Justice June 18, 2002).

In response to the COVID-19 pandemic, Congress created the Pandemic Unemployment Assistance ("PUA") program, which provides benefits for individuals whom the pandemic has prevented from working but who do not qualify for traditional UI. *See* 15 U.S.C. § 9021. An individual cannot be considered for PUA until it has been determined that she is not

16

eligible for UI. *See* Dep't of Labor, Emp. & Training Admin., Unemployment Insurance Program Letter No. 16-20, Attachment 1, at 1-9 (Apr. 5, 2020). When an individual is deemed ineligible for UI, however, the state agency is required to determine whether that individual may be eligible for PUA and provide her notice of her eligibility and instructions on how to apply for PUA. *See* Dep't of Labor, Emp. & Training Admin., Unemployment Insurance Program Letter No. 16-20 Change 1, Attachment 1, at 1-2 (Apr. 27, 2020).

Because the Spanish-speaking LEP population in Arkansas exceeds five percent, DWS has translated vital documents into Spanish. Others remain available only in English. (Appellant's App. 3087, Vol. IX; R. Doc. 131-3, at 64). According to DWS LEP Coordinator Corina Parra, while a claimant can be identified as Spanish-speaking in the DWS case management system, this does not trigger forms in Spanish to be mailed to the claimant. (Appellant's App. 2054, Vol. VI; R. Doc. 131-16, at 91). Instead, most documents sent to claimants (or otherwise produced by DWS) contain a Babel notice alerting the reader to the availability of language assistance. (Appellant's App. 3074, Vol. IX; R. Doc. 131-3, at 51).

C.     Deference to regulations not warranted.

Deference to DOL regulations is not material to the case because Murguía failed to show facts supporting intentional discrimination as required

17

under Title VI of Civil Rights Act of 1964. The District Court did not determine what deference should be given to the DOJ and DOL regulations. (Add 40; Appellant's App. 2355, Vol. VI; R. Doc. 165, at 40). Instead, the district found that the record in this case did not support inference of intentional discrimination. *Id*. This Court should do the same.

Courts frequently engage in "*Chevron* avoidance" and decline to choose between *Chevron* and *Skidmore* when the choice will not affect the outcome of the case. *See Coeur Alaska, Inc. v. Se. Alaska Conservation Council*, 557 U.S. 261, 296 (2009). Engaging in "*Chevron* avoidance" promotes judicial efficiency by avoiding the litigation uncertainties of *Barnhart* and *Mead*'s open-ended standards. *Id*. Since the level of deference is not material to this case, the Court should engage in *Chevron* avoidance as well.

If the Court determines what deference should be owed to the DOJ and DOL regulations, it should review them under *Skidmore*. The regulations of the Department of Labor may merit some deference, *see United States v. Mead Corp.*, 533 U.S. 218, 234-35, 121 S. Ct. 2164, 2175, 150 L. Ed. 2d 292 (2001), but it is by no means controlling, *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S. Ct. 161, 164, 89 L. Ed. 124 (1944). Agency rulings, statements, interpretations, and opinions are given deference proportional to their power

Appellate Case: 22-2831     Page: 29     Date Filed: 03/16/2023 Entry ID: 5256001

to persuade. *Id*, see also *Christensen v. Harris Cty.*, 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000); *De Baca v. United States*, 399 F. Supp. 3d 1052, 1178 n.184 (D.N.M. 2019) (same). Under *Skidmore*, the Court must give the agency interpretation "weight …depend[ing] upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore*, 323 U.S. at 140, 65 S.Ct.161.

The same should apply here. The guidelines and letters from the DOJ and DOL are not controlling upon this Court and DWS. The DOJ itself recognized that "[guidance] is not intended to provide a definitive answer governing the translation of written documents . . . but rather provides one, but not necessarily the only, point of reference for when a recipient should consider translations of documents in light of its particular program or activity." *See* Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons, 67 FR 41455-01. *See* also *Baouch v. Werner Enterprises*, Inc., 908 F.3d 1107, 1117 (8th Cir. 2018) (holding that the DOL regulations should be treated as persuasive authority). Therefore, *Skidmore* deference is more appropriate in this case.

Murguía relied on *Berndsen v. N. Dakota U. System*, 7 F.4th 782 (8th Cir. 2021) in support of her argument that the District Court should have applied the *Auer* deference to the agency guidance documents. In *Berndsen,* the Eighth Circuit Court of Appeals analyzed whether two ambiguous agency policies' interpretations were inconsistent. *Id.* The *Berndsen* Court applied *Auer* deference to the ambiguous interpretations. *Id.*

Here, Murguía alleges that the unemployment insurance program letters are ambiguous because they clarify what steps are reasonable for states to take when ensuring that LEP individuals have meaningful access to unemployment insurance programs. (App. Br. 24.) But the unemployment insurance program letters are not ambiguous, and use of such terms as "reasonable" or "meaningful access" does make the letters ambiguous. Murguía did not identify any other specific inconsistencies or contradictions between agency policies' interpretations. Therefore, the *Auer* deference does not apply here. The District Court correctly concluded that there was no genuine dispute of material fact as to whether DWS intentionally discriminated against Murguía on the basis of language or national origin. Summary judgment was appropriate, and should be affirmed by this Court, regardless of the level of deference given to rules governing the unemployment insurance program.

20

III.  Murguía failed to show that she was subjected to intentional discrimination under Title VI.

The District Court correctly found that Murguía failed to show sufficient facts to establish a prima facie case of intentional discrimination. (Add 19; Appellant's App. 2334, Vol. VI; R. Doc. 165, at 19). Under the *McDonnell Douglas* framework, a plaintiff bears the initial burden of establishing a prima facie case. *Tusing v. Des Moines Indep. Cmty. Sch. Dist.*, 639 F.3d 507, 515 (8th Cir. 2011). She may do so through "evidence giving rise to an inference that she has been intentionally discriminated against because of her" national origin. *Lucke v. Solsvig*, 912 F.3d 1084, 1087 (8th Cir. 2019) (emphasis added). "An inference of racial discrimination may be established by showing that a similarly-situated person of another race was treated more favorably." *Mitchell v. Dakota Cnty. Soc. Servs.*, 959 F.3d 887, 899 (8th Cir. 2020). "To be similarly-situated, the person must possess all the relevant characteristics the plaintiff possesses except for the characteristic about which the plaintiff alleges discrimination." *Id.*

However, absent an appropriate comparator, a plaintiff may present a mosaic of facts that, together, support an inference of discriminatory intent. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 (1977) (holding that "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial

21

and direct evidence of intent as may be available").  This "requires examining the totality of the relevant facts, including racially discriminatory impact, historical background, the sequence of events leading up to the challenged decisions, and legislative or administrative history." *Mensie v. City of Little Rock*, 917 F.3d 685, 689 (8th Cir. 2019) (internal quotation marks and citation omitted).  "[E]vidence that would be weak if considered alone can, if bolstered by other facts in the record, support an inference of discrimination." *Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 528 (7th Cir. 2008), as corrected (Jan. 21, 2009).

Once the plaintiff establishes a prima facie case, "the burden of production then shifts to the [defendant] to articulate a legitimate non-discriminatory reason" for its action.  *Tusing*, 639 F.3d at 515.  The defendant's explanation "must be clear and reasonably specific." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 258 (1981).

If the defendant meets that burden of production, the burden shifts back to the plaintiff "to demonstrate by a preponderance of the evidence that the stated non-discriminatory rationale was a mere pretext for discrimination." *Tusing*, 639 F.3d at 515.  "This requires more than merely disputing the reason; the plaintiff must present evidence 'that the reason was false, and that discrimination was the real reason.'"  *Lucke*, 912 F.3d at 1087–88 (*quoting*

22

*Ryther v. KARE 11*, 108 F.3d 832, 838 n.5 (8th Cir. 1997)); *see also Torgerson*, 643 F.3d at 1051 (8th Cir. 2011) (holding that plaintiff may show "pretext by persuading the court that a prohibited reason more likely motivated the employer").

In the Eighth Circuit, surviving summary judgment requires "the plaintiff [to] adduce enough admissible evidence to raise a genuine doubt as to the legitimacy of the defendant's motive, even if that evidence does not directly contradict or disprove the defendant's articulated reasons for its actions." *Lucke*, 912 F.3d at 88 (cleaned up) (quoting *Strate v. Midwest Bankcentre, Inc.*, 398 F.3d 1011, 1021 (8th Cir. 2005)).

Murguía relied on two sets of facts to prove intentional discrimination: (1) language access deficiencies, and (2) DWS employee Raymond Michaud's behavior on August 26, 2020. Each is evaluated below.

A.  Language access deficiencies did not show intentional discrimination.

"[P]rovision of English notices and program information to Spanish-speaking LEP individuals and households" may show "discrimination based on national origin." *Almendares v. Palmer*, 222 F.R.D. 324, 328 (N.D. Ohio 2004). But it does not alone establish liability. *See Mumid v. Abraham Lincoln High Sch.*, 618 F.3d 789, 795 (8th Cir. 2010) (explaining that "deficient programming in and of itself is not evidence of intentional

23

discrimination based on national origin"). The District Court correctly found that Murguía failed to present facts to show intentional discrimination, or to show that DWS's policies and conduct were motivated by national-origin animus. (Add 33; Appellant's App. 2348, Vol. VI; R. Doc. 165, at 33). It is also very well established that policy violations do not amount to a constitutional violation. *Gardner v. Howard,* 109 F.3d 427, 430 (8th Cir.1997). The District Court correctly found that any of DWS' alleged failures to provide Murguía with adequate LEP services did not amount to intentional discrimination under Title VI. (Add 21; Appellant's App. 2336, Vol. VI; R. Doc. 165, at 40).

1. Murguía's encounter with DWS on April 2, 2020.

On or around April 8, 2020, Murguía and her daughter Alejandra visited the DWS' Fayetteville office. (Appellant's App. 1189-90, Vol. IV; R. Doc. 136-1, at 32-33). Murguía stated that a "lady" who talked to her and her daughter, Alejandra, on behalf of DWS was "very nice," and "she treated [them] very well." (Appellant's App. 1267, Vol. IV; R. Doc. 136-1 at 110-111). Prior to August of 2020, Murguía believed that she was disqualified from receiving UI benefits due to a mistake in the name of her employer, which had nothing to do with her ability to speak English or her nationality. (Appellant's App. 1224, Vol. IV; R. Doc. 136-1, at 67). After her first visit

24

in April of 2020, Murguía received several letters from DWS notifying her about availability of interpreters, but she did not request any help with translation. (Appellant's App. 1196, Vol. IV; R. Doc. 136-1, at 39:21-23).

Federal regulations require DWS "to provide adequate notice to LEP individuals of the existence of interpretation and translation services and that these language assistance services are available free of charge," 29 C.F.R. § 38.9(e), and prohibit DWS from "requir[ing] an LEP individual to provide their own interpreter," 29 C.F.R. § 38.9(f)(1). Here, the District Court correctly found that the record does not support an inference that DWS was aware about Murguía's limited English capacity, or that a failure to offer an interpreter was motivated by discriminatory purpose. (Add 23; Appellant's App. 2338, Vol. VI; R. Doc. 165, at 23).

Fayetteville Office Manager John Jones testified that "[d]uring COVID, we were taking applications in huge numbers. [P]rior to COVID, we had like 69 brand new claims, and ... three weeks following, we had like 12,000 brand new claims that [were] processed through this office." (Appellant's App. 1686, Vol. V; R. Doc. 136-11, at 61). According to Jones, DWS employees often had minimal interaction with claimants in the early days of COVID-19. *See id.* at pp. 104. For the most part, claimants simply

25

dropped off paper applications, and DWS staff later manually entered the information into the DWS database to create a claim. *Id*.

The pandemic forced DWS to change its protocol in multiple ways. For example, instead of having claimants fill out their applications on computers inside local offices, claimants lined up outside and shuffled through one-by-one to hand in paper applications. (Appellee's App. 213–14; R. Doc. 52, at 213-14). According to Jones, some individuals reported standing in line for four to six hours. *Id*. DWS also stopped doing ID verification and immigration eligibility checks. (Appellant's App. 1686, Vol. V; R. Doc. 136-11, at 61). Especially in light of the COVID-19 pandemic, he District Court correctly found that there was no evidence of intentional discrimination when Murguia visited the DWS office on April 8, 2020. (Add 21; Appellant's App. 2336, Vol. VI; R. Doc. 165, at 21). This Court should affirm.

### 2. Interpreters' availability.

The DWS 2021 Language Access Plan instructs DWS' staff to first identify the LEP client's language need, and then review the "DWS Interpreter/Translator List" to determine whether a staff member is available to provide interpretation services. (Appellant's App. 1829, Vol. V; R. Doc. 136-11, at 204). DWS instructs staff to first work their way through the internal list before requesting assistance from a vendor. *Id.* DWS employs a

mix of internal and third-party interpreters. *Id.* When Fayetteville staff identify an individual as LEP, they typically first reach out to Parra before then trying other DWS employees. (Appellant's App. 1702, Vol. V; R. Doc. 136-11, at 76).

Among those employees listed on the "DWS Interpreter/Translator List," none work exclusively with LEP clients. (Appellant's App. 2077-2081, Vol. VI; R. Doc. 136-16, at 114-17). Instead, each is an employee who has volunteered to help translate—if available—when an LEP client requests assistance at a local office. *Id.* Of course, this means interpretation services may not be immediately available. *See id.* at p. 125. However, Parra testified, DWS staff can often quickly reach someone able to translate. *Id.* According to Jones, DWS staff in the Fayetteville office also rely frequently on informal interpreters, i.e., a family member or friend that accompanied the LEP client to the office. (Appellant's App. 1700, Vol. V; R. Doc. 136-11, at 74).

Murguía pointed to a series of emails that Parra received between about April 2020 to May 2021 from LEP clients seeking assistance in Spanish. (App. Br. 28.) The emails do not reflect an agency indifferent to serving the LEP population. (Appellant's App. 3111, Vol. IX; R. Doc. 131-3, at 88-111). Many contain a response from Parra asking the claimant to call her for assistance or indicate that she has contacted someone within DWS to resolve

27

an issue. *Id*. Others originate with a non-Spanish speaking DWS employee seeking help on behalf of an LEP individual. *Id*.

Similarly, Murguía alleged that the spreadsheet with complaints and inquiries about different benefit programs show intentional discrimination against Spanish-speaking individuals. (App. Br. 28.) The spreadsheet was not produced until Murguía filed her response to DWS' motion for summary judgment. (Appellant's App. 2180, Vol. VI; R. Doc. 145). The spreadsheet was inadmissible hearsay under Fed. R. Evid. 801, and Murguía did not have any knowledge about the individual claimants mentioned in the spreadsheet. *Id*. Any allegations relating to these individual claimants' experiences at DWS were a mere speculation. *Id*. The District Court correctly declined to consider the spreadsheet in its ruling pending motions for summary judgment. (Add 40; Appellant's App. 2355, Vol. VI; R. Doc. 165, at 40).

When Murguía visited the Fayetteville office with Alejandra a third time in April 2021, she requested an interpreter. (Appellant's App. 2478, Vol. VII; R. Doc. 131-1, at 101). According to Alejandra, the DWS employee disappeared for a few minutes before returning to inform them it would take some time to procure one. *Id*. Because both Murguía and Alejandra had to leave for work, they signed the necessary forms so that Alejandra could serve as an informal interpreter. *Id*. In total, Murguía and Alejandra were in the

Fayetteville office for about 15 minutes. (Appellant's App. 2481, Vol. VII; R. Doc. 131-1, at 104). In the sole instance in which Murguía requested an interpreter, she waited about 15 minutes before choosing to leave without receiving interpretation assistance. *Id*. The District Court correctly found that 15 minutes was not so unreasonable as to suggest intentional discrimination. (Add 26; Appellant's App. 2341, Vol. VI; R. Doc. 165, at 26).

    3.    Translation of vital documents.

DOL LEP regulations require DWS to translate "vital information in written materials [into Spanish] ... and make the translations readily available in hard copy, upon request, or electronically such as on a Web site." 29 C.F.R. § 38.9(g)(1). It was undisputed that DWS translated many vital documents into Spanish. (Add 26; Appellant's App. 2341, Vol. VI; R. Doc. 165, at 26). It was also undisputed DWS did not have all of its forms and documents translated into Spanish, just as it was undisputed DWS was not required to have all forms and documents translated into Spanish. *Id.* Parra testified that the English-language versions of the forms contain a Babel Notice. (Appellant's App. 2048, Vol. VI; R. Doc. 136-16, at 84). It is undisputed Murguía received letters from DWS notifying her about the availability of interpreters, and she did not request any aside from the single instance discussed above. (Appellant's App. 1196, Vol. VI; R. Doc. 136-1, at 39:21-

Appellate Case: 22-2831     Page: 40     Date Filed: 03/16/2023 Entry ID: 5256001

23). Murguía also testified that she did not receive any education beyond sixth grade, can read in Spanish "very little," and could not the declaration she purportedly signed in this case even if it had been written in Spanish. (Appellant's App. 1212, 1278, Vol. IV; R. Doc. 136-1, at 55:4-11, 121:4-10). Even if DWS had translated each document into Spanish before sending it to Murguía, it would not help her because Murguía can read in Spanish "very little." *Id*. Therefore, there was no causal connection to the harm Murguía allegedly suffered. DWS also explained that DWS' provision of some forms in English primarily impacts individuals that apply in person, and is a function of the agency out-of-date computer system. (Appellant's App. 2056-58, Vol. VI; R. Doc. 136-1, at 92-94). This testimony was undisputed. The District Court, therefore, correctly found that the evidence does not support an interference of intentional discrimination. (Add 30; Appellant's App. 2345, Vol. VI; R. Doc. 165, at 30).

Murguía essentially argues that she should had been provided with interpretation services in the manner that is satisfactory to her, and any time DWS failed short of this standard, it intentionally discriminated against her. (App. Br. 32-35.) The law does not require a state agency to implement a flawless program. *See Frazar v. Gilbert*, 300 F.3d 530 (5th Cir. 2002), reversed on other grounds, *Frew v. Hawkins*, 540 U.S. 431 (5th Cir. 2002).

Appellate Case: 22-2831     Page: 41     Date Filed: 03/16/2023 Entry ID: 5256001

Murguía, nonetheless, asserts that DWS's interpretation services lack perfection, and those imperfections violates her constitutional rights. (App. Br. 57.) This is not the standard applicable to Title VI intentional discrimination cases. The District Court correctly found that the record in this case does not contain any evidence of discriminatory animus.

In *Awnuh v. Pub. Hous. Agency of City of St. Paul*, 19-CV-2765 (ECT/TNL), 2019 WL 6492465, at *4 (D. Minn. Dec. 3, 2019), plaintiff Awnuh alleged that the Public Housing Agency ("PHA") discriminated against him based on nationality by refusing to provide adequate language interpretation services. *Id.* In support of these allegations, Awnuh stated that he "cannot read or write effectively in any language and speaks very little English," and that he attempted to alert PHA of his request for a hearing. *Id.* The United States District Court for the District of Minnesota held that plaintiff was not likely to prevail of his disparate-treatment claim because he did not present any direct evidence that the PHA's actions were motivated by discriminatory intent, and it was difficult to infer discriminatory intent from the evidence in the record concerning the PHA's conduct. *Id.* at *5–6.

In *Awnuh,* the record showed that the PHA has adopted a plan to "provide meaningful access to its programs and activities by persons with LEP." There was no evidence that PHA violated this plan in its

31

communications with Awnuh, and PHA included an interpreter insert with the termination notice as well as with the letter written in English. *Id.* The court concluded that based on Awnuh's prior dealings with PHA, including his demonstrated ability to request interpreters in the past and to communicate with his caseworker, it would be reasonable for the PHA to determine that it was not necessary to provide additional services unless Awnuh requested them. *Id.* at *5–6.

The same should apply in this case. DWS adopted Language Access Plan to provide meaningful access to its programs and activities by LEP claimants. (Appellant's App. 1312, Vol. IV; R. Doc. 136-4). DWS included the Babel notices and notifications relating to requesting interpreters into its correspondence with Murguía. (Appellant's App. 1196, Vol. VI; R. Doc. 136-1, at 39:21-23). The District Court, therefore, correctly found that Murguía failed to present evidence that any of alleged deficiencies in DWS' LEP practices stem from discriminatory animus. (Add 30; Appellant's App. 2345, Vol. VI; R. Doc. 165, at 30). This Court should affirm.

B.    Conduct attributed to Mr. Michaud.

Murguía alleged that her short interaction with a front desk DWS employee Raymond Michaud on August 26, 2020, demonstrates intentional discrimination. App. Br. 53. The District Court correctly found that there is

no claim for vicarious liability under Title VI. *See, e.g.*, *Rodgers v. Univ. of Mo. Bd. of Curators*, 56 F. Supp. 3d 1037, 1048 (E.D. Mo. 2014), aff'd as modified sub nom., *Rodgers v. Curators of Univ. of Mo. Sys.*, 634 F. App'x 598 (8th Cir. 2015). "An institution is only liable if it intentionally harassed or discriminated on the basis of race or nationality." *Id.*

In order for Mr. Michaud's failure to assist Murguía in August of 2020 to create an inference of intentional discrimination by DWS, Murguía must establish that Michaud's conduct was evidence of the agency's intent to discriminate. Some caselaw suggests—and Murguía argues—that in cases "that do not involve the official policy of the recipient entity," liability might attach under Title VI where "an official who has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998).

Here, Murguía did not suggest Michaud's behavior conforms with an informal policy within DWS, constitutes a widely-accepted practice, or even that higher-level staff approved of it. (Add 34; Appellant's App. 2349, Vol. VI; R. Doc. 165, at 34).

Appellate Case: 22-2831    Page: 44    Date Filed: 03/16/2023 Entry ID: 5256001

Nor did she show that DWS officials knew Michaud previously discriminated against LEP individuals and failed to institute corrective measures. *Id.* The District Court correctly found that Murguía failed to impute liability to DWS for Michaud's conduct. *Id*.

Even if the Court finds that DWS' Language Access policy was not followed when Murguía was not identified as LEP individual in August of 2020, Murguía cannot show that it was an intentional violation that deprived her of constitutional rights. "A deviation from an entity's internal procedure, without more, does not show discriminatory intent or itself amount to a constitutional violation, as constitutional requirements nevertheless may have been met." *Mohamed for A.M. v. Irving Indep. Sch. Dist.*, 300 F. Supp. 3d 857, 896 (N.D. Tex. 2018) (citing *Davis v. Scherer*, 468 U.S. 183, 194, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984)); *see also Z.B. v. Irving Indep. Sch. Dist.*, 3:17-CV-2583-B, 2019 WL 2716504, at *6 (N.D. Tex. June 28, 2019), *aff'd sub nom. Bhombal*, 809 F. App'x 233.

The same should apply here. An alleged single deviation from DWS' internal procedure, during the unprecedented times of Covid-19, does not show discriminatory intent or amount to a constitutional violation. Moreover, Title VI creates a private right of action for only intentional discrimination; failure to follow regulations promulgated under Title VI by itself is not

34

actionable. *Alexander v. Sandoval*, 532 U.S. 275, 293, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001). Accordingly, the District Court correctly found that Michaud's alleged failure to comply with DWS' policy on one single occasion does not create a genuine dispute related to intentional discrimination. This Court should affirm.

IV.     The District Court correctly found that Murguía's failure to identify any comparators was fatal to her claims under Title VI.

Murguía cannot prevail on her claim of discrimination because she failed to identify any comparators who were treated differently than she was treated. At the pretext stage, the test for whether someone is "sufficiently similarly situated, as to be of use for comparison, is rigorous." *Johnson v. Securitas Sec. Servs. USA, Inc*., 769 F.3d 605, 613 (8th Cir. 2014) (en banc). "[T]he individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Clark v. Runyon*, 218 F.3d 915, 918 (8th Cir. 2000).

According to Murguía, "when white people arrive[d]" in the Fayetteville office on August 26, Michaud "would have them take a seat, but the Mexicans he made stand." (Appellant's App. 1223, Vol. IV; R. Doc. 136-1, at 66). Murguía and Alejandra noticed white claimants leaving the office

with paper showing that they'd been helped, although both admitted they did not actually know the specifics of other claimants' UI applications or the type of help they received. (Appellee's App. 72–73, 137–38; R. Doc. 52, at 72–73, 137–38). The District Court correctly found that absent more information about the other clients present on August 26, 202, the Court could not rely on Murguía and Alejandra's statements. (Add 35; Appellant's App. 2350, Vol. VI; R. Doc. 165, at 35).

"A person is similarly situated to the plaintiff if he or she possesses all the relevant characteristics the plaintiff possesses except for the characteristic about which the plaintiff alleges discrimination." *Id.* Here, Murguía failed to present any evidence that the comparators were similarly situated. Murguía argues that "an inference of impermissible motive against the plaintiff may be made when there is evidence of discrimination against other members of the same protected class." *Santos v. Peralta Cmty. Coll. Dist.*, 2009 WL 3809797, at *5 (N.D. Cal. Nov. 13, 2009). However, Murguía failed to establish that DWS was aware of any discriminatory practices. In 2017—after Michaud had left DWS—the agency entered into a settlement agreement with DOL and undertook a range of remedial measures to ensure that its policies comply with the LEP policies and federal regulations. (Appellant's App. 1299-1310, Vol. IV; R. Doc. 136-2.) These include, for example, hiring Parra as LEP

Coordinator, conducting a language access needs assessment, drafting language access plans, training staff, and running an LEP outreach campaign. *Id*. Furthermore, in 2019, the DOL determined that DWS fully complied with all language access requirements and put DWS on actual notice of the compliance. (Appellant's App. 1311, Vol. IV; R. Doc. 136-3.) In 2020, Michaud was re-hired as a veteran employment representative in the in the Fayetteville office of DWS. (Appellant's App. 3380, Vol. X; R. Doc. 137-3, at 13). This position was a non-management position. *Id.* Thus, the District Court correctly found that the evidence does not demonstrate DWS possessed knowledge about Michaud that the DOL settlement agreement and subsequent remedial measures would not have addressed.

A. DWS was not notified of discrimination through Michaud's personal life.

Murguía also points to Michaud's membership in the Sons of Silence motorcycle club to argue he acted with discriminatory animus. (App. Br. 49-50). Murguía alleges that DWS should have known about Michaud's "transgression" because "he spoke about riding motorcycles," "had a recruit to come to the Rogers office and run his errands," and "had ongoing sexual relationship" with subordinate. *Id.* The District Court correctly found that none of these alleged acts put DWS on actual notice of the alleged discrimination based on national origin/language by Michaud. (Add 38;

37

Appellant's App. 2353, Vol. VI; R. Doc. 165, at 38). This Court should affirm.

> B. <u>A single SAVE search on August 26, 2020, is not evidence of discrimination.</u>

Murguía alleged that the SAVE immigration check substantiates her claim of discriminatory intent. (App. Br. 54). Under the Immigration Reform and Control Act of 1986 (IRCA), DWS must verify the immigration status of non-citizens applying for benefits. (Appellant's App. 1610-1625, Vol. V; R. Doc. 136-10). Every non-citizen claimant who applies for unemployment insurance compensation must provide valid documentation of authorization to live and work in the United States. *Id.* According to DWS, non-citizens are told to have this documentation with them at all times. *Id.* This documentation must be provided each time a claimant comes in to open an initial unemployment claim or reopen an existing claim. *Id.* There are three types of verification that must be done when a non-citizen claimant files for unemployment insurance benefits. *Id.*

DWS verified Murguia's identity using a SAVE check one time. (Appellant's App. 3238-3341, Vol. IX; R. Doc. 137-1). DWS also presented testimony relating to the backlog on the SAVE verifications due to Covid-19 pandemic. (Add 39; Appellant's App. 2354, Vol. VI; R. Doc. 165, at 39). The District Court correctly found that the record did not indicate Michaud

Appellate Case: 22-2831    Page: 49    Date Filed: 03/16/2023 Entry ID: 5256001

run an unnecessary SAVE search, endorsed such a practice, or even tacitly approved of it. *Id*. This Court should affirm.

V. Conclusion.

The District Court correctly found that Murguía cannot prevail on her claim of intentional discrimination under Title VI of the United States Code. Murguía also failed to identify any individuals who were similarly situated to her who were treated differently. Therefore, the District Court correctly granted summary judgment in favor of DWS and denied Murguía's motion for summary judgment. (Add 40; Appellant's App. 2355, Vol. VI; R. Doc. 165, at 40). This Court should affirm. The appeal should be dismissed in its entirety.

Respectfully submitted,

Tim Griffin
Attorney General

By: /s/ Maryna O. Jackson
Maryna O. Jackson
Arkansas Bar No. 2009111
Senior Assistant Attorney General
323 Center Street, Suite 200
Little Rock, Arkansas 72201
Telephone: (501) 683.3296
Fax: (501) 682.2591
maryna.jackson@arkansasag.gov
Attorneys for Appellee DWS

39

## CERTIFICATE OF SERVICE

I hereby certify that on March 16, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system for review.

By:    /s/ Maryna O. Jackson
        Maryna O. Jackson

Appellate Case: 22-2831    Page: 51    Date Filed: 03/16/2023 Entry ID: 5256001

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(A)(7)(B) because it contains 10,020 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Word 2010 in Times New Roman 14 –point font.

By: /s/ Maryna O. Jackson
Maryna O. Jackson

Appellate Case: 22-2831   Page: 52   Date Filed: 03/16/2023 Entry ID: 5256001