# IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

María Murguía
                                                Appellant/Plaintiff

     v.
                        Case No. 22-2831

Charisse Childers, in her
official capacity as Director,
Arkansas Division of Workforce
Services
                                                Appellee/Defendant

---

Plaintiff's Appeal from the U.S. District Court
Western District of Arkansas
Case No. 5:20-cv-5221
The Honorable Timothy L. Brooks

**Appellant's Reply Brief**

---

Kevin De Liban (2012044)
Trevor Hawkins (2017224)
Jaden Atkins (2020128)

Legal Aid of Arkansas
310 Mid-Continent Plz., Ste. 420
West Memphis, AR 72301
P: (800) 967-9224 x. 2206
F: (870) 910-5562

kdeliban@arlegalaid.org
thawkins@arlegalaid.org
jatkins@arlegalaid.org

**Counsel for Appellant**

# Table of Contents

Table of Contents ........................................................... ii

Table of Authorities ..................................................... iv

Argument ..................................................................... 1

**I.  Applying the *Arlington Heights* framework, a reasonable jury could infer intent from the totality of Murguía's evidence** ... 5

a. Although comparative evidence is only one type of evidence supporting Murguía's prima facie case, it is sufficient on its own to establish a prima facie case ......................................... 6

b. DWS's repeated violation of long-standing language access regulations and guidance foreseeably denied Murguía meaningful access, further evincing intent. .................................. 9

    *i. DWS's Repeated Failures to Provide Even Minimum Language Services Despite Notice of Murguía's Need* ........ 10

       1. Providing Vital Information in Spanish once Preference is Known ..................................................... 10

       2. Translation of *all* Vital Documents ............................. 16

       3. Notice of Interpreter Availability ................................ 17

       4. Timeliness and Accuracy of Interpretation .............. 19

    *ii. Foreseeability as Further Evidence of Intent* ........................ 21

    *iii. Reasonable Inference of Intent — With or Without Deference* ........................................................................... 24

Appellate Case: 22-2831     Page: 2     Date Filed: 05/11/2023 Entry ID: 5276183

c.   DWS officials' decision to place Michaud in a claimant-facing position despite knowing his discriminatory history, paired with Michaud's mistreatment of Murguía, further evinces intent.... 26

d.      DWS's far-from-flawless LEP program denied Murguía meaningful access to UI benefits ................................................... 28

II.   **To the extent that DWS's vague assertions of the pandemic and computer system limitations met its burden to provide a non-discriminatory motive for its actions, they are mere pretext** ............................................................................ 30

Conclusion ................................................................................ 34

Certificate of Service ................................................................ 36

Certificate of Compliance ......................................................... 37

Appellate Case: 22-2831     Page: 3     Date Filed: 05/11/2023 Entry ID: 5276183

# Table of Authorities

Cases

*Almendares v. Palmer*, 284 F. Supp. 2d 799 (N.D. Ohio 2003) ......... 22, 23

*Awnuh v. Pub. Hous. Agency of City of Saint Paul*, No. 19-CV-2765
(ECT/TNL), 2019 WL 6492465 (D. Minn. Dec. 3, 2019) ............ 18, 19

*Baouch v. Werner Enterprises, Inc.*, 908 F.3d 1107 (8th Cir. 2018) .......... 24

*Beeler v. Astrue*, 651 F.3d 954 (8th Cir. 2011) ........................................... 25

*Chalenor v. Univ. of N. Dakota*, 291 F.3d 1042 (8th Cir. 2002) ............... 25

*Columbus Bd. of Ed. v. Penick*, 443 U.S. 449 (1979) ........................... 10, 32

*Gardner v. Howard*, 109 F.3d 427 (8th Cir. 1997) ..................................... 23

*Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998) ..................... 26

*Hasan v. Foley & Lardner LLP*,
552 F.3d 520 (7th Cir. 2008), as corrected (Jan. 21, 2009) ................... 5

*Lewis v. Heartland Inns of Am., L.L.C.*,
591 F.3d 1033 (8th Cir. 2010) ............................................................. 5, 6

*Meagley v. City of Little Rock*, 639 F.3d 384 (8th Cir. 2011) ...................... 3

*Mensie v. City of Little Rock*, 917 F.3d 685 (8th Cir. 2019) ........................ 5

*Mumid v. Abraham Lincoln High Sch.*, 618 F.3d 789 (8th Cir. 2010) ...... 23

*Segal v. Metro. Council*, 29 F.4th 399 (8th Cir. 2022) ......... 2, 3, 4, 7, 10, 29

*Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248 (1981) ...................... 30

*Turner v. Gonzales*, 421 F.3d 688 (8th Cir. 2005) ....................................... 5

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977) ................................................................................. 5

Appellate Case: 22-2831    Page: 4    Date Filed: 05/11/2023 Entry ID: 5276183

Federal Regulations

28 C.F.R. § 42.405 ....................................................................... 1

29 C.F.R. § 38.4 ......................................................................... 11

29 C.F.R. § 38.9 ..........................................1, 10, 11, 16, 17, 18, 19, 20, 31

Exec. Order No. 13,166, Improving Access to Services for Persons
with Limited English Proficiency,
65 Fed. Reg. 50121 (Aug. 16, 2000) ............................................. 1

Guidance to Federal Financial Assistance Recipients Regarding Title
VI Prohibition Against National Origin Discrimination Affecting
Limited English Proficient Persons,
67 Fed. Reg. 41455 (June 18, 2002) ................................... 10, 17, 21

Policy Guidance to Federal Financial Assistance Recipients
Regarding the Title VI Prohibition Against National Origin
Discrimination Affecting Limited English Proficient Persons,
68 Fed. Reg. 32290 (May 29, 2003) ................................... 17, 20, 21

Appellate Case: 22-2831    Page: 5    Date Filed: 05/11/2023 Entry ID: 5276183

# Argument

A discrimination plaintiff's burden on summary judgment is straightforward: present evidence sufficient for a reasonable jury to infer that the defendant took adverse action against them based at least partly on a protected characteristic. Here, the totality of Murguía's evidence supports a reasonable inference that, based on her national origin, the Department of Workforce Services ("DWS") delayed adjudicating her Unemployment Insurance ("UI") claim, cost her $1800 in benefits otherwise available, subjected her to an unfounded fraud charge, and otherwise erected barriers to her participation in the state's UI program.

As DWS's Brief acknowledges, the "Executive Branch has long interpreted discrimination based on national origin to encompass discrimination based on limited English proficiency." (Appellee Brief 13) (citing, e.g., Exec. Order No. 13,166, 65 Fed. Reg. 50121 (Aug. 16, 2000)). DWS likewise acknowledges that, to avoid discriminating against Limited English Proficient ("LEP") individuals, the agency must take "reasonable steps" to ensure effective participation in or "meaningful access" to UI benefits. (Appellee Brief 13). *See* 28 C.F.R. § 42.405(d)(1) (Title VI); 29 C.F.R. § 38.9(b) (Workforce Innovation and Opportunity Act or "WIOA").

Appellate Case: 22-2831    Page: 6    Date Filed: 05/11/2023 Entry ID: 5276183

Murguía presented four categories of evidence which, taken together, create a material dispute on DWS's discriminatory intent. (Appellant Brief 63-67). First, she offered DWS's own spreadsheets and staff emails showing that Spanish-speaking Latinos faced a particularized form of exclusion in seeking UI benefits. Second, she identified over 20 separate agency violations of applicable language access regulations *after* DWS knew of Murguía's specific need. Third, she showed that DWS leadership placed a worker with a known history of discrimination against coworkers and claimants—including Spanish-speaking ones—on the frontlines of claimant services, where he mistreated her and refused her proper service. Finally, she discovered that DWS leadership called its language services mandate "unAmerican."

Yet, DWS's brief does nothing to undermine this essential evidence for purposes of summary judgment. Rather, DWS argues the ultimate merits of the sole contested issue, intentional discrimination, obfuscating adverse facts and asking the Court to usurp the role of a jury. (Appellee Brief 8-9).

Critically, DWS ignores this Court's unanimous 2022 holding in *Segal v. Metro Council* that evidence of a government agency's persistent failures to comply with mandatory access measures over a length of time creates a

2

discriminatory inference sufficient to survive summary judgment. 29 F.4th 399 (8th Cir. 2022). Though *Segal* addressed an ADA claim, the courts cross-apply precedent between the ADA and Title VI, requiring a showing "of discriminatory intent to recover compensatory damages" under both. *Meagley v. City of Little Rock*, 639 F.3d 384, 389 (8th Cir. 2011).

*Segal's* holding rested on comparative data of complaints indicating fundamental access disparities and violations of applicable regulations. Specifically, Segal, a "DeafBlind" rider of public transit, endured roughly three years of routine failures by bus drivers to stop appropriately to allow him to board the bus, with approximately 8.4% of Segal's rides affected. *Segal*, 29 F.4th at 405. Meanwhile, other disabled riders complained of disability-specific exclusion 153 times over a roughly five-year span. While seemingly a modest number, the Court noted that it proportionally exceeded the rate of complaints of non-disabled riders. *Id.* These facts both evinced disparate treatment and established that the transit agency violated Department of Transportation access regulations, leading the Court to reverse the grant of summary judgment. For trial, the Court instructed that the term "meaningful access" was to be construed as requiring access to services that is "substantially equal" to the services provided to non-

3

disabled people. *Id.* at 406. Further, the Court noted that the finding of meaningful access is "a decision resting exclusively within [the jurors'] province." *Id.*

Here, Murguía provides not only evidence comparable to that in *Segal*—namely that *all* of her interactions with DWS over two years were marked by access barriers—but also evidence of open agency hostility to language access practices and tolerance of a racist frontline worker with a known history of discrimination.

Accordingly, this Reply proceeds in two parts, taking the *McDonnell Douglas* test as the operative standard.[1] First, Murguía re-asserts her robust evidence in light of DWS's deflections, arguing that there is a material dispute on the prima facie case under the *Arlington Heights* totality-of-the-evidence framework. Second, she argues that DWS's vague, disputed, and unpreserved assertions of COVID or system limitations are insufficient to establish a legitimate reason for its mistreatment of Murguía or, alternatively, are mere pretext.

---

[1] As argued in her opening brief, Murguía also maintains that deliberate indifference is an applicable standard and creates a triable inference of discrimination.

Appellate Case: 22-2831     Page: 9     Date Filed: 05/11/2023 Entry ID: 5276183

## I. Applying the *Arlington Heights* framework, a reasonable jury could infer intent from the totality of Murguía's evidence.

DWS contests only whether Murguía meets the fourth element of her prima facie case under *McDonnell Douglas*, which Murguía satisfies with or without comparative evidence. *See Turner v. Gonzales*, 421 F.3d 688, 694 (8th Cir. 2005). ("The fourth element…can be met if the [plaintiff] provides some other evidence that would give rise to an inference of unlawful discrimination."). The "touchstone inquiry" is whether "circumstances permit a reasonable inference of discrimination." *Lewis v. Heartland Inns of Am., L.L.C.*, 591 F.3d 1033, 1039 (8th Cir. 2010). Courts apply the *Arlington Heights* framework to assess such inferences, which "'demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available'" under the "'totality of the relevant facts.'" *Mensie v. City of Little Rock*, 917 F.3d 685, 689 (8th Cir. 2019) (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 (1977)). "[E]vidence that would be weak if considered alone can, if bolstered by other facts in the record, support an inference of discrimination." *Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 528 (7th Cir. 2008), as corrected (Jan. 21, 2009).

Appellate Case: 22-2831    Page: 10    Date Filed: 05/11/2023 Entry ID: 5276183

While DWS cites to *Arlington Heights*, *Mensie*, and *Hasan* as applicable precedent, their lessons are apparently lost on the agency. (Appellee Brief 21-22). Rather than examine the full mosaic of evidence, DWS picks the pieces apart and asserts that each *alone* is insufficient. Based on the totality detailed below, a reasonable jury could infer intent.

a. **Although comparative evidence is only one type of evidence supporting Murguía's prima facie case, it is sufficient on its own to establish a prima facie case.**

As this Court held in *Lewis*, the comparator analysis is only proper if the plaintiff relies solely on such to establish her prima facie case. 591 F.3d at 1039-40. Whether assessing "comparative evidence" or other evidence of intent, the courts apply a "flexible evidentiary standard that was never intended to be rigid, mechanized, or ritualistic." *Id.*

Murguía relies on multiple types of evidence to create a reasonable inference of discrimination, not only comparative evidence. Thus, DWS's citations purportedly requiring stringent proof around comparators where they are the sole evidence of intent are not on point. (Appellee Brief 35-36). Nor is DWS's strawman comparator: Murguía does not rely on testimony about more favorable treatment for white claimants waiting in line. (Id.).

6

Rather, where Murguía proffers comparative evidence, she does so through DWS's records of complaints from LEP and non-LEP claimants, respectively. (Appellant Brief 28-29). The *Segal* Court examined similar evidence of complaints from both disabled and non-disabled complainants and found that disabled individuals were complaining of violations at a proportionally high rate compared to the general populace. 29 F.4th at 403-05. Applying the same logic here, this Court should look to the non-LEP complaints to determine whether LEP individuals "were or were not provided an equal opportunity to access" UI benefits. *Id.* at 404-05.

The Spanish-language complaints demonstrate inequality in access. These desperate pleas for assistance, translated by DWS into English, include a myriad of complaints: inability to understand English-language notices;[2] being refused service because they speak Spanish;[3] no interpretation services offered when contacting local offices as directed

---

[2] "I received this letter….I need a call back to receive help but I don't speak English…from someone who knows Spanish." (**App.III**, 1009; **R.Doc 130-3**, 91).

[3] "I went to the office…and no one helped me because I speak Spanish and called your number but nothing, and I am receiving letters and I don't understand….[A] governmental office should have translation in Spanish." (**App.III**, 1010, 1019; **R.Doc 130-3**, 92, 101).

7

under Babel notices,[4] including the Fayetteville office;[5] and frustration with Parra's (their sole Spanish-speaking contact) inconsistent availability to receive calls while also refusing to provide claim information via email.[6] These complaints evince barriers faced by LEP complainants that are inherently not faced by English-speaking claimants.

Not contesting the relevance of this comparative evidence, DWS argues for the first time on appeal that the spreadsheet is inadmissible. (Appellee Brief 39). Even if preserved, the arguments fails. First, DWS's insinuation that its own spreadsheet is inadmissible because the *agency* belatedly produced it is a non-starter, as DWS should not benefit from its

---

[4] "I attempted to contact the local office…because that is what the page asks me. But I am not successful because they don't have anyone who can help me because I only speak the Spanish language." (**App.III**, 1022; **R.Doc 130-3**, 104).

[5] "I am told to call the office, but Fayetteville does not answer in Spanish." (**App.III**, 1016; **R.Doc 130-3**, 98).

[6] After emailing and calling Parra repeatedly over ten days without getting through, "I am still waiting for someone to help me to be able to do my claims; if you can do it, otherwise do not toil me, and make me loose [sic] my time." (**App.III**, 1012-15; **R.Doc 130-3**, 94-97).

8

own dilatory action.[7]  Second, with respect to hearsay, the spreadsheet contains a DWS worker's *summaries* of complaints, thereby qualifying as statements of a party opponent under Fed. R. Evid. 801(d)(2)(D) or, alternatively, as business records under 803(6).  Failing either exception, Murguía may use the spreadsheet for purposes other than the truth of the matter asserted in each summarized complaint, i.e., establishing DWS's *notice* of the English-language complaints for comparison purposes.  In any case, DWS's arguments are unpreserved.

### b. DWS's repeated violation of long-standing language access regulations and guidance foreseeably denied Murguía meaningful access, further evincing intent.

DWS concedes in its written language access plans, operations manual, and brief that various federal language access regulations apply.  (**App.III**, 920-98; **R.Doc. 130-3**, 2-80); (Appellee Brief 13-16, 25, 29).  Still, DWS persistently flouted these regulations with respect to Murguía, foreseeably denying her meaningful access to UI benefits.

---

[7] DWS produced the spreadsheet months after Murguía's timely discovery request.  Murguía submitted it with her Motion for Sanctions, which the District Court considered alongside summary judgment.  (**App.I** 71, 99-110, **VI**, 2355, 2193-2194; **R.Doc 97**, 1, **97-2**, 1-12, **145**, 14-15, **165**, 40).

Appellate Case: 22-2831     Page: 14     Date Filed: 05/11/2023 Entry ID: 5276183

The courts have long recognized that a discrimination defendant's "[a]dherence to a particular policy or practice, with full knowledge of the predictable effects of such adherence" evinces intent under the *Arlington Heights* framework. *Columbus Bd. of Ed. v. Penick*, 443 U.S. 449, 465 (1979). This "foreseeable effects standard" is "one of the several kinds of proofs from which an inference of [discriminatory] intent may be properly drawn." *Id.* at 464-65. Moreover, as *Segal* demonstrates, evidence of a "potential violation" of an applicable "regulation is a factor to be weighed by the jury" in assessing intent. 29 F.4th at 405. Here, DWS's violations create a triable inference of intent, regardless of any deference owed them.

### i. DWS's Repeated Failures to Provide Even Minimum Language Services Despite Notice of Murguía's Need

The agency repeatedly violated several regulations requiring Spanish-language communication of vital information, erecting access barriers at every stage of Murguía's interactions with DWS over two years.

### 1. Providing Vital Information in Spanish once Preference is Known

DWS must make "an assessment of an LEP individual to determine language assistance needs…" and "identify LEP persons with whom it has contact." 29 C.F.R. § 38.9(b)(1); 67 Fed. Reg. 41455, 41465. Once DWS

Appellate Case: 22-2831    Page: 15    Date Filed: 05/11/2023 Entry ID: 5276183

"becomes aware of the non-English preferred language of an LEP beneficiary, participant, or applicant for aid, benefit, service, or training, [it] must convey vital information in that language." 29 C.F.R. § 38.9(h); see 28 C.F.R. § 42.405(d)(1). Information is vital when it "is necessary for an individual to understand how to obtain any aid," including "applications, consent [] forms, notices of rights and responsibilities,…rulebooks,…and letters or notices that require a response." 29 C.F.R. § 38.4(ttt). This definition recognizes that unintelligible agency communications result in effective exclusion for LEP people.

DWS was first on notice of Murguía's need upon initial application in April 2020, when Murguía spoke in Spanish to her daughter Alejandra, who interpreted for her in front of a DWS worker. (**App.I** 284-85, 301, 311-13; **R.Doc 130-1**, 12-13, 29, 39-41). Yet, DWS continued to provide Murguía documents it acknowledges contain vital information in English only. (**App.III**, 958-64; **R.Doc 130-3**, 40-43). DWS sent six such documents to Murguía prior to 9/23/20:

Appellate Case: 22-2831    Page: 16    Date Filed: 05/11/2023 Entry ID: 5276183

- 4/2/20: UI initial application (DWS-Ark-501), requesting information on her last employer, why she had separated from her last employer, etc., (**App.III**, 1042-43; **R.Doc 130-3**, 124-25);[8]

- 4/2/20: UI handbook (DWS-Ark-500), causing Murguía to misunderstand the rules for reporting part-time wages and leading to an unfounded fraud investigation and appeal, (**App.II**, 363, **III**, 887-89; **R.Doc 130-1**, 91, **130-2**, 294-96);

- 4/8/20: Notice of Monetary Determination (AAS-508), which incorrectly listed her last employer, (**App.III**, 1041; **R.Doc 130-3**, 123);

- 6/10/20: Notice of Agency Determination (AAS-578), disqualifying her from receiving UI benefits and again listing the wrong employer, (**App.III**, 1051; **R.Doc 130-3**, 133);

- 7/16/20: Notice of Telephone Hearing, listing the wrong employer as the other party for her appeal, (**App.III**, 1052; **R.Doc 130-3**, 134);

- 7/29/20: Decision of Hearing Officer, dismissing her appeal and not taking or advising any further action to correct her employer, (**App.III**, 1052; **R.Doc 130-3**, 134).

While DWS claims nonetheless that it did not know of Murguía's

language needs for these initial interactions, the agency concedes it was

---

[8] Without support, DWS blames Murguía for the initial error on her application. (Appellee Brief 14). Alejandra filled out Murguía's *English*-language application by hand at the Fayetteville office, listing Holiday Inn as the last employer. An agency worker manually entered her information into DWS's systems, creating the typewritten application incorrectly listing Molly Maid as the last employer. (**Appellee's App.I**, 59, 99-101, 148-52, 184; **R.Doc 52**, 59, 99-101, 148-52, 184). The District Court found this error was likely not caused by Murguía. (**App.VI**, 2325-26; **R.Doc 165**, 10-11).

required to provide all vital information in Spanish from 9/23/20 onward.[9]

(**App.II**, 433-35; **R.Doc. 130-1**, 161-63).   Still, DWS provided Murguía an *additional* 20 vital documents only in English:

- 9/24/20: amended Notice of Monetary Determination (AAS-508), (**App.III**, 1057; **R.Doc 130-3**, 139);

- 9/28/20: amended Notice of Agency Determination (AAS-578), still incorrectly listing her last employer, (**App.III**, 1058; **R.Doc 130-3**, 140);

- 11/2/20: Quit General—Claimant Statement (AAS525Q1C), requesting information on her separation from last employer within one week of mailing, (**App.III**, 1065-66; **R.Doc 130-3**, 147-48);

- 11/2/20: Claimant Statement—Incorrect Reason for Separation (AAS525F1C), accusing her of providing incorrect information about her separation from her last work and demanding her explanation within one week of mailing, (**R.Doc 35-2**, 12)[10];

- 2/12/21: another Quit General—Claimant Statement (AAS-525Q1C), (**App.III**, 1092-93; **R.Doc 130-3**, 174-75);

- 2/12/21: another Claimant Statement—Incorrect Reason for Separation (AAS-525F1C), (**App.III**, 1089; **R.Doc 130-3**, 171);

- 3/26/21: Notice of Agency Determination (AAS-578), indicating she was not disqualified and why, (**App.III**, 1095-96; **R.Doc 130-3**, 177-78);

- 3/26/21: same notice with a different employer, (Id.);

---

[9] As detailed in Murguía's initial brief, DWS received notice of her needs at least seven separate times.  (Appellant Brief 34-35).

[10] **R.Doc 35-2**, 12-18, were inadvertently left out of Appellant's Appendix.

Appellate Case: 22-2831     Page: 18     Date Filed: 05/11/2023 Entry ID: 5276183

- 4/1/21: fraud-related Interview Notice (FIRE-BLO2), accusing Murguía of misreporting wages and threatening a fraud finding unless she explained within one week of mailing, (**App.III**, 1101-02; **R.Doc 130-3**, 183-84);

- 4/9/21: Notice of Monetary Determination (DWS-ARK-508), now showing no base period wages or employers and providing only three days from mailing to appeal, (**App.III**, 1106; **R.Doc 130-3**, 188);

- 4/14/21: Notice of Monetary Determination (DWS-ARK-508), showing no past wages and providing *one* day from mailing to appeal, (**App.III**, 1107; **R.Doc 130-3**, 189);

- 4/22/21: Continued Claim for UI Benefits (DWS-ARK-502), requesting she confirm continued UI eligibility based on various requirements, (**App.III**, 1109; **R.Doc 130-2**, 191);

- 4/22/21: Miscellaneous Claimant Statement (ARK-AAS525M1C), asking her (in English) to waive her right to a formal interpreter based on specific risks, (**App.III**, 1111; **R.Doc 130-2**, 193);

- 4/22/21: Claimant Authorization for Legal Representation (ESD-ARK-599), authorizing (for the first time) DWS to provide Murguía's confidential information to Alejandra, (**App.III**, 1112; **R.Doc 130-2**, 194);

- 8/13/21: fraud-related Notice of Agency Determination (DWS-FIRE-578), finding that she misreporting earnings, (**App.III**, 1127-30; **R.Doc 130-3**, 209-12);

- 8/13/21: same notice reflecting a different employer, (Id.);

- 9/15/21: Notice of Telephone Hearing, indicating date of an upcoming fraud-related hearing, (**App.III**, 1131; **R.Doc 130-2**, 213);

- 9/27/21: same notice, (**App.III**, 1132; **R.Doc 130-2**, 214);

- 10/22/21: same notice, (**App.III**, 877-78; **R.Doc 130-2**, 284-85);

14

- 2/1/22: Decision of Hearing Officer, finding the fraud allegations unfounded and providing 20 days to appeal, (**App.III**, 887-89; **R.Doc 130-2**, 294-96).

Because DWS provided these vital documents in English *only*, Murguía was unable to understand and respond to each document sent without the assistance of her daughters or attorneys. (Appellant Brief 31-38). This, of course, differs from the experience of non-LEP persons. The resulting difficulties cannot be discounted in a program with complex rules, as the last employer error and fraud allegations demonstrate here.

DWS's assertion that Murguía would not have benefited from receiving vital information in Spanish due to limited reading ability is disputed. (Appellee Brief 30). Murguía attended school in Mexico until age 16-17 and stated that she "need[s] to have papers in Spanish" because she can read in Spanish better than in English. (**App.IV**, 1170-71, 1278; **R.Doc 136-1**, 13-14, 121). DWS did not establish that Murguía is totally unable to read. As such, she is entitled to the presumption that she would have been able to understand Spanish-language documents.

15

<u>2.    Translation of *all* Vital Documents</u>

Some of the vital documents listed above were provided to Murguía in English *even though* DWS has a Spanish-translated version; others were never translated into Spanish at all.

DWS is required to "translate vital information in written materials into [Spanish]." 29 C.F.R. § 38.9(g).[11]   Yet, DWS has not translated into Spanish the following vital documents sent to Murguía:

- Monetary Determination (DWS-ARK-508)

- Notice of Agency Determination (DWS-ARK-578)

- both Fraud and Non-Fraud Notices of Agency Determination (DWS-FIRE-578)

*Supra* at 11-13.  Though three of these four forms contain a statement in Spanish that the notice is important, the findings of fact, period of disqualification, law, and specific appeal rights and instructions (i.e. vital information) are only in English.  (**App.III**, 891-92; **R.Doc** 298-99). Thus, there is no way for Spanish-speaking LEP people to understand the most

---

[11] DWS acknowledges that a "significant number or portion of the population eligible to be served" in the Fayetteville office's service region speaks Spanish, thus requiring *all* vital information to be translated to Spanish.  (Appellee Brief 17); 29 C.F.R. § 38.9(g)(1).

16

pressing issue in any UI claim: whether they are eligible for benefits and how or when to contest an adverse decision.

### 3. Notice of Interpreter Availability

DWS is further required to provide "timely," "adequate notice to LEP individuals of the existence of interpretation and translation services…available free of charge." 29 C.F.R. § 38.9(d)-(e). This includes offering a formal interpreter to Murguía *even with* an informal interpreter present. 29 C.F.R. § 38.9(f)(1)-(2) (recipients "shall not require an LEP individual to provide their own interpreter" or "rely on an LEP individual's…adult family…to interpret or facilitate communication" except in two inapplicable circumstances). If Murguía waived an interpreter and chose to use Alejandra instead, DWS was still required to "make and retain a record of [her] decision to use [her] own interpreter." *Id.* Guidance provides similar instructions, emphasizing the importance of ensuring that any waiver is voluntary and recording such. *See* 67 Fed. Reg. 41455, 41462-63 (DOJ); 68 Fed. Reg. 32290, 32297 (DOL).

DWS violated this regulation (and guidance) three times. On 4/2/20 and 8/26/20, DWS failed to offer Murguía a formal interpreter or document any waiver even as staff observed Alejandra interpreting. (**App.I** 284-85,

17

290-96, 301, 311-13, **III**, 1030-1132; **R.Doc 130-1**, 12-13, 18-24, 29, 39-41, **130-3**, 112-214).  DWS violated the regulation again on 4/22/21, when Murguía had to request an interpreter and, still, staff failed to assure the *voluntariness* of her waiver, requiring her to sign English-language forms despite existing Spanish translations.  (Appellant Brief 36-37).

Nevertheless, DWS boasts its partial implementation of another, *separate* requirement—adding Babel notices in extremely small text at the bottom of some vital documents.  (Appellee Brief 43); 29 CFR § 38.9(g)(3) ("Recipients must include a 'Babel notice,' indicating in appropriate languages that language assistance is available, in all communications of vital information….").  However, DWS's tiny tagline is only received *after* application and does not indicate that language services "are available free of charge" or how to access them, thus providing untimely and inadequate notice under 29 C.F.R. § 38.9(d)-(e).  (**App.II**, 436-37; **R.Doc. 130-1**, 164-65).  And, even if the tagline were sufficient, DWS was still required to translate and send vital documents.

Moreover, DWS's purported authority in defense of its violations, *Awnuh v. Pub. Hous. Agency of City of Saint Paul*, No. 19-CV-2765 (ECT/TNL), 2019 WL 6492465 (D. Minn. Dec. 3, 2019), is not on point.  (Appellee Brief 31-

32).  In addition to the higher standard for preliminary injunctive relief, the District Court explicitly relied "on Awnuh's…demonstrated ability to request interpreters in the past and to communicate with his caseworker" to hold that the agency may have reasonably believed "that it was not necessary to provide additional services unless Awnuh requested them."  *Id.* at *3-*5.  The Court based this conclusion in part on the agency worker's compliance with internal policies justifying the denial of an interpreter in such circumstances.  *Id.* at *5.  In contrast, DWS violated its internal Language Access Plan, Operations Manual, and federal regulations at all three of Murguía's visits by failing to offer an interpreter despite notice of her need.  (**App.III**, 922-23, 930, 951-52, 963; **R.Doc 130-3**, 4-5, 12, 33-34, 45).  Moreover, unlike Awnuh, Murguía never spoke with a worker in English or indicated she did not want a formal interpreter.  Having to go to work, she declined a formal interpreter in April 2021 only after DWS could not provide one—or even an estimate when one would be available—within 20 minutes.

### 4.    Timeliness and Accuracy of Interpretation

DWS also "must" provide all "language assistance services, whether oral interpretation or written translation…in a timely manner," meaning "at a place and time that ensures equal access and avoids the delay or denial of

19

any aid, benefit, service, or training at issue." 29 C.F.R. § 38.9(d). DOL advises particular care when "important programmatic rights, such as eligibility for UI benefits, are at issue" to prevent "likely…delays for LEP persons that would be significantly greater than those for English proficient persons." 68 Fed. Reg. 32290, 32296.

Yet, the DWS worker in April 2021 refused to provide a wait time for interpretation. (Appellant Brief 36-37). Moreover, though Murguía repeatedly sought assistance from her sole Spanish-speaking contact (Parra) between September and December 2020, Parra's unavailability or non-responsiveness forced her to turn to Alejandra to fill out important forms. (Appellant Brief 37). As DOL warned, Parra's non-responsiveness *further* delayed Murguía's receipt of UI benefits. The complaints from other Spanish-speaking claimants indicate that such delays were common.

Similarly, regulations require that interpretations be "accurate." 29 C.F.R. § 38.9(d). In particular, "the quality and accuracy of language services in a UI appeals hearing…must be extraordinarily high." 68 Fed. Reg. at 32296. In the one instance DWS provided Murguía a formal interpreter, an over-the-phone UI fraud appeal, Murguía struggled to communicate

through him.  He then left mid-hearing and did not rejoin the call.  (**App.III**, 872; **R.Doc. 130-2**, 279).

Guidance notably identifies practices DWS should take to *ensure* that it "provid[es] competent interpreters in a timely manner," including hiring full-time interpreters and using telephone interpreter lines when needed.  67 Fed. Reg. at 41461-62 (DOJ); 68 Fed. Reg. at 32296-97 (DOL).  Yet, DWS employs *no* full-time interpreters, relying instead on four bilingual staff (including Parra) to "volunteer" time secondary to their primary job functions.  (Appellant Brief 39).  DWS does not track wait times for these interpreters.  And, the agency does not meaningfully use outside vendors—the Fayetteville office has not used vendor translation *even once* since at least 2015.  (Id.)

### ii.  Foreseeability as Further Evidence of Intent

DWS's numerous violations of regulations and guidance foreseeably denied Murguía meaningful access to UI benefits.  Applying *Penick*'s foreseeable effects standard, DWS knew that the agency was required to provide meaningful access to Spanish-speaking claimants and that Murguía needed Spanish-language services.  Yet, the agency flouted its obligations consistently over two years.  Per *Penick*, that knowing disregard of a

21

foreseeable discriminatory impact evinces intent. And, per *Segal*, these potential violations, when paired with the comparative evidence, create a triable discriminatory inference.

The exclusionary practices Murguía experienced are notably not new. DOL found pervasive language access deprivations following an on-site investigation in 2015. Still, DWS touts DOL's 2019 letter indicating that DWS complied with the terms of its 2017 settlement agreement, which required DWS to hire an LEP coordinator, draft a language access plan, and translate some documents. (Appellee Brief 37). These minimal steps—taken to avoid harsher DOL compliance actions—do not indicate broad or perpetual compliance with Title VI. Nor does the letter, which reviewed only DWS's on-paper compliance with the settlement terms as of a particular moment in time. (**App.IV** 1311; **R.Doc. 136-3**). Moreover, the on-the-ground experiences of Murguía and the Spanish-speaking complainants indicate that the pervasive deficiencies identified in 2015 continued to date and were known.

This case is not the first to apply *Penick*'s foreseeable effects test to state agencies' language access deprivations. In *Almendares v. Palmer*, plaintiffs alleged that the agency continued its policy of sending English-language

22

notices to LEP food stamps applicants despite the Agency's notice (through a settlement agreement) of its obligation to translate them. 284 F. Supp. 2d 799, 806-08 (N.D. Ohio 2003). The Court held this alone was sufficient to state a claim of intentional discrimination because "one could logically infer that the policy was implemented and is being continued 'because of' its impact on national origin." *Id.* The holding and foreseeability language in *Almendares* has been widely cited, including by DOJ. U.S. Dept. of Justice, Civil Rights Division, *Title VI Legal Manual*, at 63 (updated April 22, 2021).[12]

Despite recognizing *Almendares*'s application, DWS cites *Mumid v. Abraham Lincoln High Sch.*, 618 F.3d 789 (8th Cir. 2010), for the assertion that deficient programming is not sufficient to establish liability. (Appellee Brief 23-24).[13] But, *Mumid* is easily distinguishable on three bases. First, *Mumid* did not involve language access measures. Rather, the case examined whether making recently immigrated students, some of whom were learning English, wait three years to test for special education classes was

---

[12] *Available at* https://www.justice.gov/crt/book/file/1364106/download.

[13] DWS's cite to *Gardner v. Howard* is a red herring. *Gardner* examined whether violation of *internal* prison policy *per se* violated a prisoner's due process rights sufficient to surmount qualified immunity. 109 F.3d 427 (8th Cir. 1997).

Appellate Case: 22-2831     Page: 28     Date Filed: 05/11/2023 Entry ID: 5276183

*facially* discriminatory, a notably higher standard. Second, unlike the delay in *Mumid*, DWS's deficiencies are only one piece in Murguía's mosaic of facts. Third, DWS's actions plainly violated applicable regulations and guidance absent from *Mumid*.

### iii. *Reasonable Inference of Intent – With or Without Deference*

*Segal* made clear that violations of anti-discrimination regulations and comparative data can constitute a prima facie case. However, such violations are even *more* forceful evidence here, where longstanding regulations and agency guidance documents are entitled to *Chevron* and *Auer* deference, respectively. (Appellant Brief 9-20).

DWS lacks authority for its claim that *Skidmore* deference is appropriate for all cited Title VI regulations and guidance. DWS's sole citation to *Baouch v. Werner Enterprises, Inc.*, 908 F.3d 1107 (8th Cir. 2018), as "holding that the DOL regulations should be treated as persuasive authority" is misleading. (Appellee Brief 19). *Baouch* did not consider the authority of any regulations in determining recipients' Title VI obligations. Rather, *Baouch* held that the "DOL Handbook" (DOL's self-described internal "operations manual" providing only "general administrative guidance") was persuasive authority regarding FLSA violations. *Id.* at 1117.

24

In contrast, Murguía cites regulations defining "national origin discrimination" that were enacted following notice-and-comment rulemaking pursuant to properly delegated rulemaking authority. (Appellant Brief 10-20). As DWS does not argue that the definitions in these regulations are *unreasonable*, they are entitled to *Chevron* deference. *See Beeler v. Astrue*, 651 F.3d 954, 959 (8th Cir. 2011).

DWS further misapprehends Murguía's argument for *Auer* deference to DOJ and DOL's guidance documents. *Auer* deference is appropriate for "any reasonable construction" asserted in "an agency's interpretation of its own regulations" where "ambiguous." *Chalenor v. Univ. of N. Dakota*, 291 F.3d 1042, 1046 (8th Cir. 2002). DWS neither argues that the guidance documents present an *unreasonable* construction of "reasonable steps" nor for any other interpretation under which DWS could argue compliance. Thus, assuming *arguendo* that "reasonable steps" and "meaningful access" are not ambiguous terms, DWS implicitly acknowledges that it is out of compliance with Title VI. (Appellee Brief 20). That is, either DWS is out of compliance with known guidance documents owed *Auer* deference, or the guidelines' advised steps so obviously constitute the "reasonable steps" prescribed in regulations that DWS's failure to take them violates Title VI.

In either scenario, DWS's violations of decades-old DOJ and DOL regulations and guidance is sufficient evidence of intent—with or without deference—as in *Segal*. Murguía's prima facie case is only strengthened by additional evidence not present in *Segal*: DWS's placement of an employee with a history of discrimination on the front lines of client services.

### c. DWS officials' decision to place Michaud in a claimant-facing position despite knowing his discriminatory history, paired with Michaud's mistreatment of Murguía, further evinces intent.

DWS largely ignores Michaud's mistreatment of Murguía, instead re-asserting without evidence that DWS did not know of Michaud's conduct. However, as both DWS acknowledges and *Penick* and *Gebser v. Lago Vista Indep. Sch. Dist.* demonstrate, liability attaches where DWS knew of the danger Michaud presented and placed him in a position to discriminate against Murguía anyway. 524 U.S. 274, 290 (1998); (Appellant Brief 64; Appellee Brief 33).

DWS officials knew of the danger Michaud presented through multiple complaints against him, including for national origin discrimination. (Appellant Brief 43-48). Most relevantly, a bilingual worker complained that Michaud both prevented her from assisting LEP claimants

26

and generally mistreated Latino claimants. Further, DOL in its investigation findings specifically identified violations at the Rogers office, which Michaud then managed. (Appellant Brief 43). If this was not enough, multiple coworkers knew of Michaud's involvement with a local outlaw biker gang with Nazi ties, for which he was the founding President. And, he had gang recruits run errands for him out of the DWS office. (Appellant Brief 49-50).

Yet, DWS officials chose to place Michaud in a *claimant-facing* position—a front desk worker charged with handling "whatever [claimants] were needing addressed"—increasing his opportunities to discriminate against claimants. (**App.II**, 695; **R.Doc. 130-2**, 102). DWS's Equal Opportunity Manager knew the danger presented as she received *each* complaint against Michaud and DOL's 2016 investigation findings letter. (Appellant Brief 43-48). Though charged with ensuring DWS's compliance with anti-discrimination laws, she *still* signed Michaud's re-hiring paperwork. (**App.III**, 1000, **XI**, 3787-93; **R.Doc 130-3**, 82, **137-9**, 38-44). At minimum, DWS's notice of Michaud's likelihood to mistreat LEP claimants is disputed.

Considering Michaud's history, his mistreatment of Murguía on 8/26/20 comes as no surprise. Michaud failed to offer an interpreter, provided incorrect information, and refused to accept Murguía's paystubs in violation of internal policies, causing further delay in fixing her wrong-employer issue. (Appellant Brief 42). Murguía and Alejandra left the office feeling angry and helpless, not knowing how to proceed, and describing Michaud as "racist" based on demeanor. (Id.). Foreclosing any argument of good faith, Michaud took the time to run an unauthorized "SAVE check" on her immigration status two minutes after she arrived. (Appellant Brief 42, 54-55). As DWS admits, SAVE checks are proper only upon opening or re-opening an unemployment claim. (Appellee Brief 38). Michaud did neither. (**App.III**, 1034; **R.Doc 130-3**, 116). A reasonable jury could infer that he denied her service based in part on national origin, for which liability attaches based on his history.

### d. DWS's far-from-flawless LEP program denied Murguía meaningful access to UI benefits.

DWS's violations directly impacted Murguía's ability to understand and respond to the wrong-employer issue, leading to a year-long delay in her receipt of benefits, denying her $1800 in additional benefits (no longer

available), and putting her through an additional year-long fraud investigation and related appeals. (Appellant Brief 26-42). At every point in this process, Murguía had to take steps to ensure access that English-speaking claimants do not, including waiting for a daughter to be available to go with her to the local office or make her weekly claims. (Id.) The extra hoops Murguía had to jump through represent additional harm from DWS's denial of meaningful access, ultimately denying her *timely* access to benefits meant to assist her in sustaining herself and her family at a time of desperate need. Though DWS asserts that Murguía or her attorneys should have reported or remedied her access issues sooner, DWS is solely responsible for its Title VI obligations. (Appellee Brief 5-6). *See Segal*, 29 F.4th at 405 ("[T]he question…is not Segal's ability to successfully navigate the Metro Transit system despite its shortcomings, but whether Metro Transit was meeting ADA requirements."). And, as the comparative evidence indicates, these barriers do not affect English-speaking claimants. As the exclusionary effects were foreseeable, a reasonable jury could infer intent.

Such an inference is stronger in light of one DWS executive's written comment in the face of DOL's requirement that DWS improve its language services: "This is so unAmerican." (**App.VI**, 2205-07; **R.Doc. 145-1**, 1-3). This

29

statement captures a rare snapshot of an official's national origin-based hostility towards required language access improvements.

Still today, DWS condescendingly casts Murguía's pleas for even minimal access measures as a demand that DWS provide "flawless" services "in the manner that is satisfactory to her." (Appellee Brief 30). Like the "unAmerican" comment, DWS's treatment of these deficiencies as minor reflects its deeper antipathy towards its language access obligations. Murguía's experiences are not minor deficiencies or mistakes; they demonstrate *fundamental* access problems for significant portions of claimants that DWS serves. On the totality of evidence, a reasonable jury could infer intent, shifting the burden to DWS.

## II. To the extent that DWS's vague assertions of the pandemic and computer system limitations met its burden to provide a non-discriminatory motive for its actions, they are mere pretext.

DWS's vague assertions of computer system limitations and the pandemic fail to meet its acknowledged burden to assert a "legitimate, non-discriminatory reason" for its actions that is "clear and reasonably specific." *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 258 (1981); (Appellee 22). Alternatively, Murguía has established a triable issue on pretext.

DWS's only purportedly legitimate explanation for sending Murguía English versions of the limited vital documents it *had* translated to Spanish is raised for the first time on appeal. Namely, DWS claims that its computer system does not allow agency workers to note Spanish-language preference in claimants' electronic files, preventing DWS from sending claimants who applied in person Spanish-language notices. (Appellee Brief 30; Appellant Brief 57-58). This is disputed. DWS did not proffer any witness attesting to technical limitations, and Parra clarified that workers *can* notate Spanish-language preference manually. (**App.VI**, 2062-63; **R.Doc 136-16**, 99-100). Moreover, DWS managed to send Murguía three notices in Spanish. (Appellant Brief 33-34). While too few, sporadic, and insignificant to constitute meaningful access, these establish that DWS could send Spanish-language notices to Murguía.

Even if computer system limitations were established, DWS's decision to implement—and the related failure to correct—a system depriving swaths of LEP claimants of translated information only cement the discriminatory inference. DWS's language service obligations persist regardless of which "program delivery avenue (e.g., electronic, in person, telephonic)" the claimant uses to access benefits. 29 C.F.R. § 38.9(c). Here, Pamela Vance

31

(who made the "unAmerican" comment) and LEP Coordinator Parra, were both "responsible for the development and testing" of current systems. (**App.IV**, 1310; **R.Doc 136-2**, 12). Both knew of widespread language access deficiencies: Vance through DOL investigation findings and Parra through complaints from frustrated LEP claimants. Nonetheless, they implemented the current computer system as-is, with Parra triumphantly declaring it "[t]he pinnacle of the ADWS' LEP Program." (Id.). This out-of-court comment touting the system as exemplary betrays DWS's claim now that the system is outdated. Moreover, the comment emphasizes DWS's intent in implementing the current system and non-intent to change it. At least two officials knowingly implemented the current system with "full knowledge of the predictable effects," depriving LEP claimants of vital information. *Penick*, 443 U.S. at 465. Thus, absent context indicating why such deficiencies were implemented and why updates are not feasible, DWS fails to assert a sufficiently detailed justification.

Beyond computer limitations, DWS's remaining justification is vague assertions of the pandemic, similarly lacking "clear and reasonably specific" detail.

Some assertions are not tied to Murguía's experience and, thus, irrelevant. For instance, DWS's explanation for failing to offer interpretation services in April 2020 is that *some* claimants just dropped off documents. (Appellee Brief 25). But, Murguía spoke in Spanish in front of the worker and relied on Alejandra to interpret, so the worker knew her language preference. Similarly, claims of pandemic-related SAVE backlog are pretextual. The appropriate *circumstances* to run a SAVE check did not change due to any backlog in SAVE checks, which internal emails indicate that Murguía's April 2020 application pre-dated regardless. (Appellant Brief 54-55).

Other such assertions are so vague as to be meaningless. For instance, DWS claims that the "pandemic forced DWS to change its protocol in multiple ways" but identifies no policy change explaining the violations that Murguía suffered. (Appellee Brief 37). Notably, COVID-19 did not alter DWS's obligations to ensure meaningful access. (Appellant Brief 53).

Most telling is what the pandemic cannot explain. The pandemic cannot explain why, after identifying in 2017 vital documents requiring translation, DWS failed for three years *pre-pandemic* to translate all such documents and update its systems to ensure that known LEP claimants

consistently receive them. (**App.III**, 928-29; **R.Doc. 130-3**, 10-11). The pandemic cannot explain why DWS never hired a full-time interpreter or why the Fayetteville office has not used a vendor interpreter since at least 2015. The pandemic cannot explain its "unAmerican" comment when those deficiencies were identified. And, the pandemic cannot explain why DWS placed Michaud in a claimant-facing position, knowing the danger he presented, or why Michaud refused her paystubs while checking her immigration status. Thus, a reasonable jury could find either that DWS failed to establish a legitimate justification or that Murguía has established that the proffered justification is mere pretext.

## Conclusion

Murguía has presented sufficient evidence under either a deliberate indifference or *McDonnell Douglas*/*Arlington Heights* framework from which a reasonable jury could infer discriminatory intent, and DWS has failed to present legitimate, alternative explanations for its actions. Accordingly, Murguía respectfully requests that this Court reverse the District Court and allow her to proceed to trial.

Dated:  May 11, 2023

Respectfully Submitted,

By: */s/ Jaden Atkins*
Jaden Atkins
Kevin De Liban (2012044)
Trevor Hawkins (2017224)
Jaden Atkins (2020128)

LEGAL AID OF ARKANSAS
310 Mid-Continent Plaza, Ste. 420
West Memphis, AR 72301
P: (800) 967-9224 x. 2206
F: (870) 732-6373
kdeliban@arlegalaid.org

35

**Certificate of Service**

I, Jaden Atkins, certify that, on May 11, 2023, I electronically filed the foregoing Brief with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/EFC system.

*/s/ Jaden Atkins*

Jaden Atkins

Appellate Case: 22-2831    Page: 41    Date Filed: 05/11/2023 Entry ID: 5276183

**Certificate of Compliance**

Pursuant to Federal Rule of Appellate Procedure 32, I, Jaden Atkins, state that the applicable portions of this brief contain 6500 words in proportionally sized 14-point Book Antiqua font. The brief was prepared in Microsoft Office Word for Microsoft 365 and has been scanned for viruses and is virus free.

*/s/ Jaden Atkins*_____
Jaden Atkins

Appellate Case: 22-2831    Page: 42    Date Filed: 05/11/2023 Entry ID: 5276183